RAYMOND R. HALADAY AND JANE M. HALADAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Haladay v. Commissioner
Docket No. 19192-85
United States Tax Court
T.C. Memo 1990-45; 1990 Tax Ct. Memo LEXIS 45; 58 T.C.M. (CCH) 1302; T.C.M. (RIA) 90045; January 25, 1990
*45 From 1970 to at least 1985, petitioners owned and operated a farm. Petitioners consulted experts from the Department of Agriculture's Soil Conservation Service, and for 11 years followed a plan prepared by that agency. Petitioners raised cattle and hogs, as well as some crops to feed the livestock. Petitioners suffered a series of natural disasters and other setbacks, including two hurricanes, a cattle-killing disease, a food poisoning incident, and a drought. Each petitioner spent more than 40 hours per week working on the farm, although petitioner husband also worked full-time as a businessman. Petitioners incurred substantial losses for each of the years in which they ran their farm. Held: Petitioners engaged in their farming activity with an actual and honest objective of making a profit, and are thus entitled to deduct their farming losses (sec. 183, I.R.C. 1954) as well as take investment credits (sec. 38, I.R.C. 1954) for 1981 and 1982. *46 S. Paul Mazza, for the petitioners. Edward F. Peduzzi, Jr., for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners for 1981 and 1982 in the amounts of $ 13,699 and $ 8,161, respectively. After concessions by the parties and deemed concessions by petitioners, [1] the issue for decision [2] is whether petitioners' farming activity constitutes a trade or business, rather than an "activity * * * not engaged in for profit", within the meaning of section 183(a). [3] *47 *48 FINDINGS OF FACT [4]
*49 Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Raymond H. Haladay (hereinafter sometimes referred to as "Raymond") and Jane M. Haladay (hereinafter sometimes referred to as "Jane"), husband and wife, resided in Bloomsburg, Pennsylvania. Raymond was born on a farm. During the summer months from about 1947 through 1955, Raymond, then about age 10 through 18 years old, worked on one or another of three farms owned by each of his older sisters. Petitioners have been married since 1961. They have two sons. Before 1970, Jane had never lived on a farm nor had any farming experience. Since 1965, when their younger son was born, Jane did not have any employment, outside the Haladay household and farm, from which income could be derived. In 1962, Raymond, with two of his brothers -- Frank and John -- built a building for their business known as Midway Distributors, Inc. (hereinafter sometimes referred to as "Midway") in Danville, Pennsylvania. Raymond and his two brothers were equal shareholders in Midway and started Midway's operations in *50 1963. Raymond has been engaged in the conduct of Midway's business since that time. Raymond and his two brothers planned to operate Midway for about 10 years and then each would buy adjoining farms. Midway's business was the wholesale distribution of sporting goods, hardware, and equipment. Frank died in 1970; John was killed in 1975. Sometime before John died, he bought a farm. After Raymond's brothers' deaths, other family members came into the Midway business. After his brothers' deaths, Raymond was the manager and major shareholder of Midway, owning more than 71 percent of the stock. Raymond's job at Midway was highly stressful, and contributed to his health problems. Raymond's brother Frank, who died in 1970, died of a heart attack at age 50. Another of Raymond's brothers died in 1971 of a heart attack at age 61. For 1972 through 1984, Raymond received income from Midway and interest income as listed in table 1. Table 1 Year
Midway Income
Interest Income [5]
Total
1972
$ 16,855
--
$ 16,855
1973
18,030
--
18,030
1974
20,200
--
20,200
1975
40,525
--
40,525
1976
30,475
--
30,475
1977
30,200
$    297
30,497
1978
40,775
7,297
48,072
1979
43,475
9,338
52,813
1980
57,500
12,506
70,006
1981
39,363
17,694
57,057
1982
32,936
18,661
51,597
1983
72,254
11,498
83,752
1984
58,305
7,400
65,705
*51 In 1970, petitioners bought a 106-acre farm (hereinafter sometimes referred to as "the Farm") located in Bloomsburg, Columbia County, Pennsylvania. The purchase price of the Farm was $ 25,000, which was paid by cash ($ 3,000) and a purchase money mortgage ($ 22,000). The purchase price for the Farm included the land, a barn, and a house, but did not include any farm equipment. In 1975, petitioners refinanced the Farm, and gave a new mortgage in the amount of $ 40,000, using $ 10,000 of which to pay off the purchase money mortgage and $ 30,000 to buy equipment and cattle. At the time petitioners bought the Farm, it was run down and had not been farmed for 7 or 8 years. The house and the barn were also in disrepair. Raymond remodeled the barn and the house and built calf pens. During 1970 and 1971, petitioners were preparing to farm, but did not file any Schedules F with their income tax returns for those years. Raymond's brother-in-law grew crops on the Farm in 1971 to build up a feed inventory for the calves Raymond intended to get. In 1971, petitioners requested and obtained a Soil *52 and Water Conservation Plan (hereinafter sometimes referred to as "the SCS plan") from the United States Department of Agriculture Soil Conservation Service (hereinafter sometimes referred to as "SCS"). The SCS plan was designed specifically for the Farm and included a map of the Farm. The SCS plan was a long-range plan which included land improvement requirements, drainage and water control management, and wood lot management. The SCS plan was designed to help petitioners improve the quantity and quality of their crop production through improved farm technology, increased efficiency in the planning of crops, and suggesting what kind of crops should be planted in a given area. The SCS plan required construction of diversion terraces to control the flow of water on the Farm and the installation of about 10,000 to 11,000 feet of drain tile. Petitioners and their sons installed the drain tiles over a period of several years. Raymond built the diversion terraces. SCS personnel advised and provided engineering assistance for petitioners' implementation of the SCS plan. Raymond took soil samples which were tested by the soil testing laboratory of Pennsylvania State University to *53 determine what areas were feasible to farm and what type of crops were best suited for the soil. Petitioners were told that their land was best suited for corn and oats. In order to prepare the Farm for planting, petitioners and their two sons had to clear 30 acres of land. This involved cutting and pulling of briars, trees, and weeds; tilling the soil; and applying pesticides and herbicides. It took petitioners more than 11 years to complete the SCS plan. SCS made payments (hereinafter sometimes referred to "SCS payments") to petitioners in the amounts shown in table 2, for work petitioners did in implementing the SCS plan; the amounts were based on certain percentages of petitioners' expenses in that work. Table 2 SCS Payments
1972
$ 1,810.92
1973
312.43
1974
2,664.00
1976
1,716.18
Petitioners generally bought 2-day-old calves which they raised until the calves became marketable cattle. The cycle usually took at least 3 years. Petitioners did not breed calves. Table 3 shows the number of cattle bought and sold, and their gross sales price, during 1972 through 1983. Table 3 Cattle Bought and Sold [6]
Year
Bought
Sold
Gross Sales Price
1972
26
0
-0-
1973
35
16
$  5,000.00
1974
120
40
8,000.00
1975
0
0
-0-
1976
0
29
8,914.83
1977
0
12
4,207.16
1978
21
3
1,225.00
1979
0
2
1,251.20
1980
33
6
4,006.15
1981
18
2
1,510.00
1982
0
12
7,837.16
1983
0
19
12,993.44
*54 Petitioners used the crops grown on the Farm and on neighboring farms to feed the calves. In exchange for the crops grown on the neighboring farms, petitioners prepared, planted, and harvested the landowners' neighboring farms. Petitioners also used feed supplements which they mixed and ground with the crops when feeding the calves in order to maximize the calves' growth. At certain times between 1972 and 1983, petitioners had more than 200 tillable acres (comprised of the Farm and neighboring farms) under their management, for purposes of growing crops in order to feed the calves. During the time of their farming operation, petitioners suffered a series of setbacks and disasters beyond their control. In 1972, Hurricane Agnes destroyed 90 percent of petitioners' crops. In 1974, a pneumonia-type disease killed 56 cattle. A veterinarian advised petitioners not to bring any more cattle on the Farm until the disease was eradicated; petitioners did not buy any cattle during *55 1975, 1976, and 1977. See table 3, supra. In 1975, Hurricane Eloise damaged about 80 percent of petitioners' crops. In 1978, in an effort to increase the Farm's profitability, petitioners raised hogs in addition to calves. Table 4 lists the number of hogs bought and sold during 1978 through 1980. Table 4 Hogs Bought and Sold [7]
Year
Bought
Sold
Gross Sales Price
1978
15
18
$ 2,134.72
1979
0
37
4,007.75
1980
0
54
4,875.22
In 1980, a food poisoning incident killed 10 or 12 mature cattle worth about $ 10,000. In 1981, there was a drought severe enough that the county was declared a disaster area. In 1983, petitioners sold the last of any kind of livestock that they had on the Farm. Petitioners and their two sons worked on the Farm. Raymond worked on the Farm about 6 hours a day on those days when he worked at Midway. Before he went to work at Midway, he spent 2 to 3 hours in the barn. When he came home from Midway, he did barn work and whatever else was necessary. Raymond also *56 worked about 14 hours per day on the Farm on his 2 days a week off from Midway. He spent time plowing, planting, harvesting, mending fences, and repairing farm equipment. He was also responsible for buying and selling the livestock. Jane worked more than 40 hours a week on the Farm. On a typical work day, she fed and watered the calves and hogs. She also cleaned out the hog pens. While working on the Farm, she suffered from allergic reactions to hay and oats. She had difficulty breathing; she had sore throats; sometimes her eyes swelled part way shut and at least once she broke out in hives. Petitioners' sons also worked on the Farm 15 to 20 hours a week. Their biggest project was removing manure. Petitioners maintained records from 1972 through 1983, showing the amount of machinery bought, expenses for fuel and oil, lime and fertilizer, seed and pesticides, feed, livestock, hired labor, and general expenses. These records were sufficiently accurate and detailed that all income and expense items connected with the Farm's operation have been substantiated. In the process of carrying on their farming activities, petitioners never kept graphs or charts which would track expenses *57 and income; never used records to form the basis for any projections or forecasts; never prepared or sought to have prepared such projections or forecasts; never had a budget analysis done for them nor did one themselves; never drew up decision trees in an effort to understand the reasons for their continued losses and to thus change business practices in order to turn profit; never installed a cash flow recordkeeping system in order to get a clearer view on their profit potential; and did not keep a separate bank account specifically for their farm activities. Petitioners' gross farm income, expenses, and losses reported on their Schedules F for 1974 through 1982, and gross farm income and losses for 1972, 1973, 1983, and 1984, are listed in table 5. [8]
Table 5 (Amounts rounded to nearest dollar)
Year
Revenue
Taxes
Interest
Depreciation
Other Exp. [9]
Losses
1972
$  2,561
[10] N/A
N/A  N/A
N/A
$  2,824
1973
6,712
N/A
N/A  N/A
N/A
5,008
1974
8,496
$  73
$   180  $  4,677
$ 12,725
9,159
1975
546
118
180  11,511
6,134
17,397
1976
12,112
105
2,561  6,842
6,195
3,593
1977
7,086
107
3,668  6,529
3,487
6,705
1978
2,174
116
3,559  6,062
10,288
17,851
1979
5,407
131
3,261  7,317
11,677
16,979
1980
9,283
138
3,131  8,808
14,263
17,057
1981
3,275
163
2,990  9,688
24,498
34,064
1982
10,915
225
2,834  12,668
16,767
21,579
1983
14,204
N/A
N/A
N/A
N/A
5,999
1984
10,194
N/A
N/A
N/A
N/A
4,101
*58 During the years in which petitioners conducted their farming activity, petitioners grew vegetables for their own consumption and slaughtered cattle to provide meat for their family. Petitioners do not know whether the costs incurred in raising the calves slaughtered for their own use were deducted as expenses on their tax returns for 1981 and 1982. In 1982, Raymond advertised to sell the Midway business in order to farm full time. In 1985, petitioners stopped their farming operation and rented their farm land for $ 1,500 per year to other farmers. In 1986, petitioners believed that their land was worth about $ 150,000. * * * During 1981 and 1982, petitioners conducted their farming activity with an actual and honest objective of making a profit. OPINION Respondent contends that petitioners did not engage in farming with the objective of making a profit, but rather had the motivation of deriving pleasure from farming as a hobby. Accordingly, respondent argues that the claimed deductions for losses *59 and expenses, as well as the claimed investment credits, are not allowable. Petitioners maintain that they have shown that they had an actual and honest objective to make a profit from their farming activities, and that the mere fact that a reasonable person would have quit farming when faced with repeated losses and disasters should not result in a finding that they did not have a profit objective. We agree with petitioners. In the context of the instant case, the effect of section 183(a)[11] is that petitioners' disputed deductions and credits are allowable but only if their farming activities were engaged in for profit. *60 Whether an activity is engaged in for profit is determined under section 162 and section 212 (except insofar as section 183(d) creates a presumption that the activity is engaged in for profit). See sec. 183(c). Whether an activity is engaged in for profit turns on whether the taxpayer has an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (CADC 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (CA9 1981). Petitioners' objective is a question of fact to be determined from all the facts and circumstances. Allen v. Commissioner, 72 T.C. 28, 34 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (CA2 1979), affd. on another issue 615 F.2d 578 (CA2 1980). Mere statements of intent are not determinative. Engdahl v. Commissioner, 72 T.C. at 666; Churchman v. Commissioner, 68 T.C. 696, 701 (1977). *61 The burden of proof is on petitioners. Golanty v. Commissioner, 72 T.C. at 426; Boyer v. Commissioner, 69 T.C. 521, 537 (1977); Rule 142(a). Section 1.183-2(b)(1)-(9), Income Tax Regs., sets out the following factors (principally derived from case law, see Benz v. Commissioner, 63 T.C. 375, 382-383 (1974))[12] to be taken into account in determining a profit objective, or lack of one: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. However, no one factor is conclusive and thus we do not reach our decision herein by merely counting the nine factors enumerated which support each party's *62 position. Dunn v. Commissioner, 70 T.C. at 720. We conclude, and we have found, that petitioners had an actual and honest profit objective during the years in issue. This is based on our observations of petitioners at *63 trial, the substance of their testimony and the other evidence, and our analysis of the evidence under the factors laid out in the regulations. We consider these factors seriatim. (1) Manner of Carrying on the Activity
Raymond was a successful businessman. In an ideal world, he would have applied his sound business judgment to his farming venture by cutting his losses and abandoning farming after having lost money year after year. We acknowledge that an objective, reasonable person might have realized after a few years of disasters and losses that farming was not likely to be a profitable bonanza. However, we note that the reasonable person's standard is not dispositive here. The taxpayer's expectation of profit need not be a reasonable one; it is sufficient if the taxpayer has a bona fide objective of realizing a profit. Dreicer v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs.
Petitioners kept records of receipts and expenditures from 1972 through 1983. Although petitioners did not institute recordkeeping systems that could have helped them improve their operations, their records were good enough (the parties have stipulated) to substantiate *64 all their farm income and expenses. Petitioners also expanded their operations from raising cattle to include the raising of hogs in an attempt to increase the Farm's profitability. We conclude that petitioners carried on their farming activity more or less in a businesslike manner. (2) Expertise of Taxpayer or Advisors
Petitioners had both the personal knowledge of Raymond and professional advice to help them run the Farm. When Raymond was a teenager, he had worked on his sisters' farms. Furthermore, petitioners consulted the SCS one year after buying the Farm. Not only did petitioners request and obtain an SCS plan, but they also completed all of the suggested improvements and changes that the plan contained. The SCS payments (see table 2, supra) indicate SCS's satisfaction with petitioners' execution of the SCS plan. We conclude that petitioners' request for expert advice from the SCS and subsequent dedication to following the SCS plan indicates a profit objective. Although petitioners did not plant corn and oats as suggested by the SCS plan, but rather chose the unfortunate course of raising cattle (and for a while, hogs), it is not clear that petitioners would *65 have done better if they had concentrated on growing the suggested crops. Thus, the fact that petitioners consulted experts and, for the most part, followed the resulting advice demonstrates their genuine objective to make a profit from the Farm. (3) Time and Effort Expended in Activity
Although he had a highly stressful, full-time job at Midway, Raymond spent more than 40 hours per week on feeding and bedding the hogs and cattle; plowing, planting, and harvesting the land; and repairing fences and equipment. Jane worked more than 40 hours per week on the Farm, even though the nature of some of the work caused her to suffer severe allergic reactions. The two Haladay sons also worked on the Farm for 15 to 20 hours per week after school and on weekends. The fact that petitioners expended so much time and effort in farming is a strong factor in leading us to conclude they had a profit objective. (4) Expectation That Assets May Appreciate
Petitioners bought their property for $ 25,000 in 1970. Petitioners farmed the land themselves for 15 years, clearing it and building diversion terraces on it. In 1985, petitioners rented their land to other farmers for $ *66 1,500 per year. Petitioners believed that, at the time of the trial, the property was worth about $ 150,000. We conclude that although petitioners might have had an expectation that the property would appreciate in value, there is no evidence that petitioners expected this appreciation to be enough to exceed the total expenses of operating the Farm over the entire 15 years.
(5) Taxpayer's Success in Other Activities
Raymond was successful as the manager and major shareholder of Midway, a wholesale sporting goods business. We note that table 1, which lists Raymond's income from Midway, shows a wide range of yearly incomes. Raymond's Midway income ranged from a low of $ 16,855 in 1972 to a high of $ 72,254 in 1983. His Midway income did not steadily rise, but rather fluctuated. The wholesale sporting goods business is sufficiently dissimilar from farming that even if Raymond's Midway business had been a consistently profitable one, a conclusion that the farming activity should have been equally profitable would not be warranted. (6) History of Income or Losses From the Activity
Petitioners engaged in the farming activity for about 15 years, sustaining losses *67 well past the length of time that could be called the "start-up" period. However, the losses were due, at least in part, to disasters beyond the control of petitioners. For example, in 1972, Hurricane Agnes destroyed 90 percent of their crops. In 1974, a disease similar to pneumonia killed 56 of their cattle, and prevented petitioners from buying any more cattle during 1975, 1976, and 1977. In 1975, Hurricane Eloise damaged 80 percent of their crops. In 1980, food poisoning killed 10 or 12 of their cattle. Finally, in 1981 a drought damaged the Farm. Although a long history of losses is an important criterion, it is clear that that factor is not necessarily determinative of a lack of a profit objective. See, e.g., Engdahl v. Commissioner, 72 T.C. at 669 (deductions allowed in spite of 12 straight years of losses in a horse breeding operation); Allen v. Commissioner, 72 T.C. at 34-35 (deductions allowed in spite of 12 straight years of losses in a ski lodge operation). Moreover, as we noted in an early case, "If losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the *68 farmers of the country would be outside the pale." Riker, Executor v. Commissioner, 6 B.T.A. 890, 893 (1927). Accordingly, we conclude that, on the basis of the record in the instant case, petitioners' string of losses is not a strong indication that petitioners did not engage in farming with a profit objective. (7) Amount of Occasional Profits Earned
We next consider the amount of occasional profits earned. In the 13 years of income and losses shown in table 5, petitioners received between $ 546 (in 1975) and $ 14,204 (in 1983) in revenue from the Farm. Thus, the amount of yearly income varied widely. Revenue for the 13 years included in table 5 totals $ 92,965, while losses total $ 162,316. Thus, the ratio of losses to revenues was about 1.75 to 1 for those years. We conclude that petitioners' history of revenues and losses from their farming activity indicates other than a profit objective. (8) Taxpayer's Financial Status
Petitioners had substantial income from Midway. However, this income was clearly not reliable and varied widely from year to year. For example, Raymond's Midway income for 1981 was $ 18,137 less than his Midway income *69 for 1980. His 1982 income was $ 6,427 less than that for 1981, and his 1983 income was $ 39,318 more than that for 1982. (See table 1, supra.) Thus, although petitioners had substantial income from nonfarm sources during certain years, that income was so erratic and varied so widely that we conclude that petitioners could not and did not rely on a steady stream of high annual income from Midway. Thus, we conclude that petitioners' financial status for the years in issue is inconclusive in determining their profit objective. (9) Elements of Personal Pleasure or Recreation
Finally, it is important to note that petitioners' experiences in attempting to operate the Farm were nightmarish. Petitioners suffered through disaster after disaster. It is unlikely that petitioners could have foreseen or prevented the effects of the 1972 and 1975 hurricanes, the pneumonia-type disease that attacked their cattle, the food poisoning incident, or the drought. Furthermore, Jane suffered allergic reactions which caused hives and swelling of her eyes. Petitioners have been attempting to sell their holdings in Midway since 1982 so that they can devote all their efforts to farming. *70 These facts lead us to determine that petitioners derived little, if any, personal pleasure from their farming activities. On the other hand, we conclude that petitioners may have derived some element of personal satisfaction in seeing their farming efforts produce livestock and crops, and that they believed that farming would eventually mean a healthier and more satisfying way of life for them. However, as the regulations state, "An activity will not be treated as not engaged in for profit merely because the taxpayer had purposes or motivations other than solely to make a profit." Sec. 1.183-2(b)(9), Income Tax Regs.
We conclude that although several of the factors in the regulations may support respondent's position and some other factors may be viewed as neutral, when looked at as a whole the facts are in petitioners' favor. We believe that petitioners engaged in farming during the years in issue with an objective to make a profit. Accordingly, the losses that they incurred in that activity during 1981 and 1982 are deductible, and they are entitled to the investment tax credits for those years. We have found that petitioners used for their own food some of the cattle they *71 raised and some of the crops they produced. There is no evidence in the record in the instant case that the costs they incurred were backed out of their farming expenses. Unlike the matters discussed in n. 1, supra, respondent has not determined, and does not assert, that the costs petitioners so incurred are not deductible even if the Farm were to be held a trade or business. Rather, respondent seeks to use the incurrence of these costs as a reason why we should hold that the Farm was not a trade or business. In effect, respondent has taken an all-or-nothing approach with regard to these costs. This matter has not resulted in petitioners losing on the basic trade or business issue. In light of respondent's approach, we decline to make any finding as to how much of petitioners' deducted expenses are properly nondeductible because they were used to provide food for petitioners. Having failed to take all, respondent takes nothing on this matter. We hold for petitioners. To take account of the foregoing and petitioners' concessions (see n. 1, supra), Decision will be entered under Rule 155. Footnotes
1. Petitioners initially contested respondent's disallowance of a 1982 deduction of $ 1,800 paid to petitioners' youngest son for work on their farm, and a 1981 deduction of $ 1,860 paid for the purchase of calves. On brief, petitioners failed to address these issues. We treat this failure as, in effect, a concession by petitioners. See subparagraphs (4) and (5) of Rule 151(e); Money v. Commissioner, 89 T.C. 46, 48 (1987). By stipulation, the parties compromised the conservation expense issue, and petitioners conceded an interest issue. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice & Procedure. ↩
2. The claimed investment credit is derivative and depends on the resolution of the issue for decision. ↩
3. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
4. Rule 151(e)(3) provides as follows: RULE 151. BRIEFS * * * (e) Form and Content: All briefs shall contain the following in the order indicated: * * * (3) Proposed findings of fact (in the opening brief or briefs), based on the evidence, in the form of numbered statements, each of which shall be complete and shall consist of a concise statement of essential fact and not a recital of testimony nor a discussion or argument relating to the evidence or the law. In each such numbered statement, there shall be inserted references to the pages of the transcript or the exhibits or other sources relied upon to support the statement. In an answering or reply brief, the party shall set forth his objections, together with his reasons therefor, to any proposed findings of any other party, showing the numbers of the statements to which his objections are directed; in addition, he may set forth alternative proposed findings of fact. In the instant case, the parties filed simultaneous briefs. In violation of Rule 151(e)(3), petitioners' opening brief does not include proposed findings of fact; their answering brief does include proposed findings of fact, but does not include responses to respondent's proposed findings of fact. As a result, respondent was deprived of the opportunity to respond to petitioners' proposed findings of fact. Under the circumstances, we have assumed that (1) petitioners do not object to respondent's proposed findings of fact except to the extent that petitioners' proposed findings of fact are clearly inconsistent therewith, and (2) respondent does object to petitioners' proposed findings of fact except to the extent that respondent's proposed findings of fact are clearly consistent therewith.↩
5. $ 7,266 of the interest income for each of the years 1981 and 1982 was from Midway.↩
6. The record indicates that some of the cattle died, but does not include enough information for a finding that those deaths account for the entire difference between the cattle bought (253) and sold (141).↩
7. The record does not include enough information for a finding to explain the difference between the hogs bought (15) and sold (109).↩
8. Schedules F were not offered into evidence for 1972, 1973, 1983, and 1984.↩
9. Other expenses include conservation, fuel and oil, fertilizer, accounting, repairs and maintenance, seed, supplies, hogs, and calves. ↩
10. Amounts are not available.↩
11. SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter [i.e., chapter 1, relating to normal taxes and surtaxes] except as provided in this section. [The subsequent amendment of this provision (by sec. 5(a)(23) of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1694) is effective for taxable years beginning after December 31, 1982, and so does not affect the instant case.]↩
12. Section 1.183-2(c), Income Tax Regs., presents several examples to illustrate the provisions of section 1.183-2, Income Tax Regs. In their opening brief, petitioners claim that example (4) presents a "situation * * * similar to the Haladay farming operation in many ways." In his answering brief, respondent disagrees with petitioners' claim, then states the following: In the final analysis, the cited regulations and the examples under these regulations are interpretive only, and are certainly not legislative. Thus, the reliance placed by the petitioners on this example in the regulations is at once misguided and unfounded. It is most unusual to find respondent thus attacking Treasury regulations. As we note, the nine factors that we discuss are principally derived from case law. Thus, even if we were to disregard the regulations, as respondent seems to urge, our analysis and our conclusion in the instant case would not be changed.↩