T.C. Memo. 1999-372


UNITED STATES TAX COURT


RALPH E. WESINGER, JR. AND CATHERINE R. WESINGER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 17610-97, 12694-98.    Filed November 8, 1999.

Ps deducted losses sustained in their cattle-ranching and aircraft-rental operations.  R disallowed these deductions on the grounds that the ranching and rental activities were not engaged in for profit within the meaning of sec. 183, I.R.C., and also assessed accuracy-related penalties under sec. 6662, I.R.C.

    <u>Held</u>: On the facts, the cattle-ranching and aircraft-rental activities were not engaged in with a profit objective, and Ps are not entitled to deduct the losses therefrom.

    <u>Held</u>, <u>further</u>, Ps failed to establish that they exercised reasonable care in deducting such losses and are thus liable for accuracy-related penalties based on negligence.  R's determinations are sustained.

<u>Steven J. Roth</u>, for petitioners.

<u>Andrew R. Moore</u> and <u>Caroline Tso Chen</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, <u>Judge</u>: In these consolidated cases, respondent determined the following deficiencies and accuracy-related penalties with respect to petitioners' Federal income taxes for the taxable years 1992 through 1995:

| <u>Year</u> | <u>Deficiency</u> | <u>Penalty</u><br><u>Sec. 6662(a)</u> |
|------|------------|------------|
| 1992 | $10,616 | $2,123 |
| 1993 | 23,276 | 4,655 |
| 1994 | 16,264 | 3,253 |
| 1995 | 4,521 | 904 |

Respondent also disallowed Schedule F deductions of $33,134 for petitioners' 1996 taxable year, thereby reducing the net loss claimed for that year. However, respondent did not determine a deficiency for 1996. We consider facts with relation to other years to the extent we deem necessary to redetermine petitioners' income tax liability for the years before the Court. See sec. 6214(b).

After concessions, the issues remaining for decision are:

(1) Whether petitioners' cattle-ranching activities constituted activities not engaged in for profit within the meaning of section 183, for the taxable years 1992 through 1995;

(2) Whether petitioners' rental of their personal aircraft constituted an activity not engaged in for profit within the meaning of section 183, for the taxable years 1992 and 1993;

(3) Whether petitioners are liable for section 6662(a) accuracy-related penalties on account of negligence, for the taxable years 1992 through 1995.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations filed by the parties, with accompanying exhibits, are incorporated herein by this reference.

Ralph E. and Catherine R. Wesinger (petitioners) are married and resided in Livermore, California, when they filed their petitions. However, because no evidence was presented as to Mrs. Wesinger's involvement in the ranching and rental operations, our discussion of these activities will focus upon Mr. Wesinger (petitioner).

Petitioner was born and raised in Concord, Massachusetts. He then attended the University of Massachusetts for 2 years and took courses in computer science and general liberal arts, but he did not earn a degree. Shortly after leaving the University of Massachusetts, he was hired by Digital Equipment Corporation (Digital). Petitioner remained with Digital for approximately 4 years and during that time worked as a computer systems

specialist, a layout designer for a chip set, and a field service representative. Then, in 1980, he left Digital and started his own business, Scientific Research Management Corporation (SRMC), in San Jose, California. SRMC was engaged in the building and servicing of custom computers. By 1989, although SRMC was begun without a formal business plan and with little capital, the company's annual gross income had reached $2.8 million.

In late 1989 and early 1990, petitioner purchased 282 acres of unimproved land (parcel 1) in Modoc County, California, for approximately $80,000. He intended to raise cattle on the property and hoped, in the future, to change and slow down his fast-lane lifestyle. Prior to acquiring this land, petitioner's experience with farming operations consisted of helping out occasionally on two dairy farms near where he grew up and visiting a ranch in New Zealand between five and seven times, for 1 to 2 weeks per visit. Petitioner did not seek any professional assistance at the time he purchased parcel 1 with regard to whether the land was suitable for cattle ranching. Petitioner also did not prepare a formal business plan detailing how a profit was to be made from the ranching operations. His plan was to "buy cows, feed cows, sell cows." However, due in part to lack of rainfall, petitioner never grazed any cattle on parcel 1, and he sold the land in June of 1996 for $156,000.

During his ownership of parcel 1, in June of 1992, petitioner purchased an additional 512 acres of unimproved land in Modoc County (parcel 2) for approximately $145,000. Parcel 2 was near, but not contiguous with, parcel 1. As with parcel 1, petitioner intended to raise cattle on parcel 2, but he neither investigated the suitability of the land for grazing nor prepared any formal business plans for operation of the ranch prior to making the acquisition.

Then, in 1993, petitioner had fencing installed on parcel 2 and purchased 23 head of cattle from a neighbor. However, while the cattle were still in the possession of the seller, petitioner hired a cowboy in June of 1993 to perform an informal grass survey. When this survey indicated that the grasses on parcel 2 would not support the cattle, and before the animals were placed on the property, petitioner resold the cattle to the seller at the same price.

Petitioner also did not graze any cattle on his land in 1994 and 1995. A well was dug on the property during these years, and, in late 1995, petitioner began removal of sagebrush from the land. In addition, in November of 1995, a field inventory report from a United States Department of Agriculture soil conservationist was obtained. This report identified the soil

types on the property and the potential plant communities for such soils, but it did not indicate the number of cattle the land was capable of supporting in its current condition.

In 1996, petitioner placed cattle on his ranch for the first time, grazing 23 head. Animals were also placed on parcel 2 in 1997 and 1998, when 40 and 33 head, respectively, were grazed. With regard to other activity on the property, petitioner dug an additional well in 1996, began ripping the land in 1997 for purposes of growing alfalfa, and planted a 40-acre field of winter wheat in 1998. He also obtained additional field inventory reports in 1997 and 1998. The 1997 report recommended grazing no more than 17 animals with the land in its current condition, and all reports addressed the use of an irrigation system to facilitate increased grass, crop, and animal production. As of early 1999, no alfalfa had been planted, no winter wheat had been harvested, and parcel 2 was not yet irrigated.

Through 1996, petitioner visited his ranch 15 to 17 times per year and stayed 3 to 4 days per visit. He kept no separate books and records for his ranching operations, but he recorded the checks and receipts relating to the ranch in a separate file on his personal computer. He then gave this information each year to his accountant for use in preparing petitioners' tax return.

Also throughout the years in issue, petitioner worked 40 or more hours per week at SRMC and received a salary for his services. Petitioner Mrs. Wesinger was likewise employed by SRMC during these years and was compensated for her work as the Human Resources manager. However, during the period following petitioner's decision to embark upon a ranching venture, SRMC began experiencing business reverses. An audit by the IRS and a subsequent bank audit disrupted the company's operations and culminated in 1993 with the bank calling its outstanding loan to SRMC of $2.8 million. SRMC was forced to seek sources of short-term credit and eventually paid the debt in 1997. Meanwhile, in 1994, petitioner began the process of changing SRMC's primary line of business from custom hardware to Internet-related software. Several patents dealing with this software either have been issued to petitioner or are pending, and petitioner expects the new technology to generate a profit in the future. As of early 1999, SRMC (now known as NES) was not making money.

Yet another event affecting petitioners' economic situation during the years at issue was a hurricane which damaged property they held in Hawaii. The damage occurred in late 1992 and necessitated that time be spent in Hawaii during the following winter, but the situation was largely resolved by the spring of 1993.

One further item bearing upon petitioners' income and finances for the contested years was the rental of a personal aircraft. Petitioner owned a 1979 Turbo Dakota plane. This aircraft was both flown by petitioner for his personal use and rented to SRMC for business use. Petitioner kept a handwritten log of flight times, which indicated the number of hours flown and the purpose of the usage. In 1992 and 1993, the years as to which respondent disallowed plane losses, trips labeled business accounted for an approximate 17 to 22 percent of the total usage. Travel related to the ranch ranged between three-fourths and two-thirds of the total hours. The remaining time was apparently devoted to other personal use, as no evidence was presented of rentals, or attempts to rent, to additional third parties.

Petitioner charged SRMC an hourly lease rate when the company utilized the plane for traveling to customer premises. He set the price by calling local businesses that rent aircraft and inquiring what they charged for similar machines. He then established a price consistent with the local market. Using this practice, petitioner's aircraft-rental operations reported losses in 1990, 1992, 1993, and 1997. Profits were generated in 1991, 1994, 1995, and 1996.

The overall financial impact of the circumstances related above is summarized in the following table. The ranch losses deducted for 1992 through 1995, the years at issue, totaled

$117,328. The aircraft-rental losses deducted for the contested years, 1992 and 1993, totaled $6,907.

| Year | Claimed Adjusted Gross Income | Gross Income From Ranch | Ranch Expenses | Ranch Profits & Losses | Aircraft Rental Profits & Losses |
|------|------|------|------|------|------|
| 1990 | $426,342 | $0 | [1]$890 | $0 | -$4,065 |
| 1991 | 420,991 | 0 | [1]728 | 0 | 11,500 |
| 1992 | 446,673 | 0 | 23,714 | -23,714 | -2,999 |
| 1993 | 319,573 | 0 | 36,099 | -36,099 | -3,908 |
| 1994 | 157,390 | 0 | 26,931 | -26,931 | 4,698 |
| 1995 | 63,407 | 0 | 30,584 | -30,584 | 9,858 |
| 1996 | -7,325 | 1,659 | 34,793 | -33,134 | 2,275 |
| 1997 | -96,744 | 33,784 | 39,024 | -5,240 | -158 |
| 1998 | | [2]35,274 | [2]18,036 | [2]17,328 | |

[1] During these years, the property taxes for the ranch were deducted by petitioners on Schedule A of their Form 1040.

[2] $33,000 of the gross income in 1998 consists of consulting fees paid to petitioner for the planning and building of a ranch. These are estimated amounts because petitioners' 1998 tax return had not been filed at the time of trial.

OPINION

We must decide whether or not petitioners' cattle ranching and aircraft rental were activities engaged in for profit within the meaning of section 183.

Petitioners contend that their objective with respect to these ventures was at all times to make a profit, and that the costs incurred were therefore properly deductible under section 162 as ordinary and necessary expenses of carrying on a trade or business. Conversely, respondent argues that the requisite

profit objective was lacking.  Hence, according to respondent, petitioners were not entitled to deduct losses sustained in the ranching and rental operations and are liable for the deficiencies determined by respondent.  We agree with respondent that, on these facts, petitioners failed to establish the mandatory profit objective.

### Evidentiary Issue

As a preliminary matter, before addressing the substantive issues related to profit objective, an evidentiary objection raised by respondent must be decided.  Respondent filed a motion in limine to exclude the testimony of petitioners' expert, Jonathan Cosby, a certified public accountant.  The Court permitted petitioners to make an offer of proof and reserved ruling on the admissibility of the evidence.

Rule 702 of the Federal Rules of Evidence, which governs the admissibility of expert testimony, reads as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Here, Mr. Cosby's testimony fails to meet this standard. His statements were neither specialized in nature nor helpful to the Court.  His in-court testimony consisted of broad generalizations (e.g., neither absence of a business plan nor failure to consult with experts necessarily indicates lack of

profit objective). His written report largely restates facts already in the record and offers no independent research. Mr. Cosby has never been engaged in the business of cattle ranching and has not made any study of profitable cattle operations upon which to base his comparisons. Respondent's motion in limine is granted.

Statutory Provisions and Interpretation – For Profit Activity

Section 183(a) states the following general rule: "In the case of an activity engaged in by an individual * * *, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) then goes on to prescribe that, if an activity is not engaged in for profit, a taxpayer may take those deductions which would be allowable without regard to profit motive (e.g., certain interest and tax expenses). Furthermore, if the activity is not engaged in for profit, section 183(b)(2) permits the taxpayer to claim those deductions which would be allowable if the activity were engaged in for profit, "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." In other words, because deductions for expenses related to a not-for-profit activity are generally limited to the amount of gross

income from that particular activity, the practical effect of section 183 is to preclude a taxpayer from deducting losses incurred in such ventures.

An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business expenses] or under paragraph (1) or (2) of section 212 [expenses incurred in the production of income]." See also sec. 1.183-2(a), Income Tax Regs. Deductions are allowable under these sections only if a taxpayer's "primary purpose and intention in engaging in the activity is to make a profit." Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The taxpayer's expectation of a profit need not be reasonable, but he or she must possess an "actual and honest objective of making a profit." Keanini v. Commissioner, 94 T.C. 41, 46 (1990) (quoting Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983)).

Conversely, no deductions are allowable under section 162 or 212 for "activities which are carried on primarily as a sport, hobby, or for recreation." Sec. 1.183-2(a), Income Tax Regs. In determining the category into which a particular venture falls, the taxpayer bears the burden of establishing the requisite profit objective. Keanini v. Commissioner, supra at 46; Golanty

v. Commissioner, supra at 426.  However, greater weight is accorded to objective facts and circumstances than to a taxpayer's mere statement of intent.  See sec. 1.183-2(a), Income Tax Regs.

A nonexclusive list of factors set forth in section 1.183-2(b), Income Tax Regs., guides section 183 analysis by indicating relevant facts and circumstances for consideration: (1) Manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.

### Application – Cattle Ranching

#### 1. Manner in which the taxpayer carries on the activity.

Section 1.183-2(b)(1), Income Tax Regs., provides that carrying on an activity in a businesslike manner may be indicative of profit objective.  The regulations further identify three practices consistent with businesslike operations: (1) Maintaining complete and accurate books and records; (2) conducting the activity in a manner substantially similar to

profitable businesses of the same nature; and (3) attempting changes in methods and techniques to improve profitability.  See id.  A fourth practice, that of establishing a business plan, is added by case law as likewise evidencing businesslike operations. See Sanders v. Commissioner, T.C. Memo. 1999-208.

First, with respect to books and records, petitioner here did not maintain separate books for his ranch operations. Instead, petitioner simply recorded the checks and receipts relating to the ranch in a separate file on his personal computer.  He then annually gave this information to his accountant for use in preparing petitioners' tax return.  This minimal record keeping, however, falls short of what has been identified by courts as signaling a bona fide intent to profit.

For example, in Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987), the Court explained:

> The purpose of maintaining books and records is more than to memorialize for tax purposes the existence of the subject transactions; it is to facilitate a means of periodically determining profitability and analyzing expenses such that proper cost saving measures might be implemented in a timely and efficient manner.

Hence, while a sophisticated accounting system is not necessary, "the usage of cost accounting techniques that, at a minimum, provide the entrepreneur with the information he requires to make informed business decisions" is essential.  Id.  The Court reasoned that "Without such a basis for decisions affecting the enterprise, the incidence of a profit in any given period would

be a wholly fortuitous result." Id. Given this standard, the
Court in Burger found the taxpayers' annual posting to a ledger
from bills and receipts accumulated throughout the year, under
headings for revenues and expenses, to be insufficient. See id.
The Court declared the ledger inadequate for any meaningful cost
analysis, in part because it failed to allocate costs and
overhead among the animals of the taxpayers' dog-breeding
operations. See id. As a result of this failure, the taxpayers'
records did not provide enough information for even determining
what the break-even point might be for dog sale purposes. See
id. The annual posting was also fatal to the taxpayers'
contentions because it precluded frequent monitoring of costs and
profitability. See id.

Similar focus on maintaining records useful in making
business decisions is found in Dodge v. Commissioner, T.C. Memo.
1998-89, affd. without published opinion 188 F.3d 507 (6th Cir.
1999). In that case the taxpayers kept invoices and receipts for
their horse-breeding business and maintained an itemized list of
expenses. See id. Nonetheless, the Court noted that
"petitioners did not prepare any business or profit plans, profit
or loss statements, balance sheets, or financial break-even
analyses for their horse-breeding activity." Id. This lack of

detail, keeping only the minimum records necessary to prepare tax returns, was considered by the Court to be an indication that the activity was not carried on for profit.  See id.

Moreover, even in Golanty v. Commissioner, 72 T.C. at 430, where the taxpayer kept a separate ledger on a monthly basis for her horse-breeding enterprise, the Court stated that "there has been no showing that books and records were kept for the purpose of cutting expenses, increasing profits, and evaluating the overall performance of the operation."  The Court labeled these records merely "the trappings of a business" because the taxpayer "failed to show that she used them to improve the operation of the enterprise."  Id.

Petitioner here, like the taxpayers in Burger, Dodge, and Golanty, appears to have kept the minimum records necessary to prepare his tax returns.  As indicated above, simply maintaining lists or files of expenses and receipts, without any further cost accounting or analysis, carries little weight in establishing a profit objective.

Second, as regards similarity with comparable businesses, neither petitioner nor respondent has offered any evidence as to how profitable cattle ranches are run.  However, it seems unlikely that entrepreneurs seriously intending to profit from a

ranching venture would allow land allegedly purchased for that purpose to sit unused for 6 years before first placing cattle on the property.

Third, concerning attempts to improve profitability through changes in methods and techniques, petitioner's efforts in this area for the years in issue can again only be termed minimal. Fencing was installed in 1993.  Two wells were added to the property between 1994 and 1996.  Sagebrush removal was begun in late 1995.  Yet, 1996 was the first year any cattle were grazed. Spreading a small number of improvements over the 7-year period of ranch land ownership, from 1990 to 1996, cannot overcome petitioner's failure to abandon more expeditiously the provenly unprofitable technique of grazing no cattle.

Fourth, regarding a business plan, petitioner is correct in asserting that lack of a formal, written business plan is not determinative of lack of profit objective.  See Sanders v. Commissioner, T.C. Memo. 1999-208.  Nonetheless, some indication of "a plan for success (i.e., profitability)" should be given. Id.  Petitioner's situation and "buy cows, feed cows, sell cows" testimony here seem analogous to that in Sanders, where the Court stated: "Given the substantial, but expected, costs associated with the Schedule F activity, we need more than petitioner's representation that he could make money if he sold enough horses at high enough prices to conclude that petitioner had a plan to

make a profit." Id. Petitioner here testified, without any supporting data, that he would need to sell approximately 40 cows to make a profit, but in none of the years at issue did he ever attempt to place 40 animals on his property. It is therefore doubtful that petitioner had any plan to profit in those years.

Thus, based on the above considerations, petitioner's cattle ranch does not appear to have been operated in a businesslike manner. This factor fails to indicate a profit objective.

## 2. The expertise of the taxpayer or his advisors.

Section 1.183-2(b)(2), Income Tax Regs., reads:

Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit motive where the taxpayer carries on the activity in accordance with such practices. * * *

Case law further explains that "While a formal market study is not required, a basic investigation of the factors that would affect profit is." Burger v. Commissioner, T.C. Memo. 1985-523; see also Engdahl v. Commissioner, 72 T.C. 659, 668 (1979); Underwood v. Commissioner, T.C. Memo. 1989-625. Moreover, in considering this factor, courts have made clear that the focus is upon expertise and preparation with regard to the economic aspects of the particular business, and failure to possess or obtain expertise in this area will not be excused by study of other aspects of the enterprise or by general business acumen.

See, e.g., <u>Golanty v. Commissioner</u>, 72 T.C. at 432; <u>Sanders v. Commissioner</u>, <u>supra</u>; <u>Dodge v. Commissioner</u>, <u>supra</u>; <u>Underwood v. Commissioner</u>, <u>supra</u>; <u>Burger v. Commissioner</u>, <u>supra</u>.

For instance, in <u>Golanty v. Commissioner</u>, <u>supra</u> at 432, the Court recognized that the taxpayer was an intelligent person who had acquired a good deal of knowledge about horses and their breeding. Nonetheless, the Court emphasized that because the taxpayer "never consulted any books nor any person who gave her advice regarding the business side of the operation", she "failed to show that she sought or acquired the expertise that would enable her to turn the horse-breeding operation into a profitable business." <u>Id.</u>

Similarly, the Court in <u>Burger v. Commissioner</u>, <u>supra</u>, first observed that the taxpayers there "read numerous books and periodicals pertaining to the breeding of dogs and consulted with individuals whom petitioners considered to be expert in the field". Again however, the Court found these activities not indicative of a profit objective because the taxpayers undertook the venture "without consulting with any experts on the business end of the activity" and "with no concept of what their ultimate costs might be, how they might operate at the greatest cost efficiency, how much revenues they could expect, or what risks could impair the generation of revenues." <u>Id.</u>

Cases following <u>Burger</u> are replete with analogous statements. In <u>Underwood v. Commissioner</u>, <u>supra</u>, the taxpayers were "successful in business" and "experienced investors", but "Despite this business background, * * * failed to adequately investigate" their new venture before embarking. The Court in <u>Dodge v. Commissioner</u>, T.C. Memo. 1998-89, likewise opined with regard to a taxpayer admittedly "expert and knowledgeable about horses": "Significantly, petitioners did not seek professional or economic advice on the economic aspects of horse breeding." A nearly identical emphasis is seen in <u>Sanders v. Commissioner</u>, <u>supra</u>: "While petitioner received free and paid advice from individuals he considered 'experts' in the cutting horse industry, the advice did not focus on the economic aspects of the activity."

Viewing the present matter in light of these judicial pronouncements, petitioner here is similarly bereft of the requisite economic expertise. He had no previous experience with the cattle-ranching business. No advice with regard to the economic side of the venture was ever sought prior to or during the years at issue. Furthermore, even attempts to gain expertise regarding the operational side of a cattle ranch were both tardy and minimal. Petitioner did not ask a cowboy for an informal opinion on whether the land had sufficient grass for cattle until June of 1993. He did not obtain a professional analysis of the

soil on his property or its suitability for ranching until November of 1995. He also did not receive any estimate of the number of cattle his ranch could support (which turned out to be only 17) until 1997. This scenario of holding ranch land for years without even determining whether it could economically or physically support a profitable operation is hardly consistent with a profit objective.

3. The time and effort expended by the taxpayer in carrying on the activity.

Section 1.183-2(b)(3), Income Tax Regs., specifies that devoting much personal time to an activity, as well as withdrawal from another occupation in order to devote such time, may be evidence of a profit objective. Although the regulations do not define the term "much", cases offer some guidance as to qualifying quantities. In a large percentage of decisions where time spent was found to be probative of intent to profit, the taxpayers were devoting more than 30 hours to the enterprise on a weekly basis. See, e.g., Engdahl v. Commissioner, supra at 670 (taxpayers spending an average of 35 to 55 hours per week on horse-breeding venture); Dodge v. Commissioner, supra (husband and wife combining for approximately 35 hours per week spent working on horse farm); McGuire v. Commissioner, T.C. Memo. 1992-542 (taxpayer spending more than 40 hours per week on cattle business); Haladay v. Commissioner, T.C. Memo. 1990-45 (husband and wife combining for more than 80 hours per week spent working

on farm activities); <u>Ellis v. Commissioner</u>, T.C. Memo. 1984-50 (taxpayer spending 30 to 35 hours per week engaged in care and training of his horses).  Also, even where lesser amounts have been validated as evidence of profit objective, the expenditures have typically been regular and consistent.  See, e.g., <u>Givens v. Commissioner</u>, T.C. Memo. 1989-529 (taxpayer spent 2 to 4 hours daily on weekdays doing farm chores and more time on weekends); <u>Christensen v. Commissioner</u>, T.C. Memo. 1988-484 (taxpayer worked 11 consecutive days at another occupation, during which time he usually spent several evening hours on his challenged activities, then worked 4 consecutive days of at least 8 hours each on his challenged venture).

Here, in contrast, petitioner testified to going to the ranch only 15 to 17 times a year during the years at issue and spending 3 to 4 days per visit.  No evidence was presented as to the hours of labor expended while there.  Furthermore, while limited time spent may be excused where a taxpayer employs competent personnel to carry on the activity, sec. 1.183-2(b)(3), Income Tax Regs., petitioner offered no record of having hired anyone to run his ranching operations.  Thus, the time and effort devoted by petitioner amounted, on average, to visiting approximately once or twice a month, for the equivalent of a long weekend.  On these facts, petitioner's level of involvement would appear to be more akin to a hobby than a business.

4. Expectation that assets used in activity may appreciate in value.

Section 1.183-2(b)(4), Income Tax Regs., identifies asset appreciation as potentially relevant to the profit analysis. However, in the case of farm property, the standard for determining if such appreciation may be considered differs depending on whether land is held primarily for appreciation or primarily for farming.  See, e.g., Engdahl v. Commissioner, 72 T.C. at 668 n.4; Hoyle v. Commissioner, T.C. Memo. 1994-592; Ellis v. Commissioner, supra.  If land is held primarily to profit from the increase in value, "the farming and holding of the land will be considered a single activity only if the income derived from farming exceeds the deductions attributable to the farming activity which are not directly attributable to the holding of the land", such that "the farming activity reduces the net cost of carrying the land".  Sec. 1.183-1(d)(1), Income Tax Regs.  Conversely, if asset appreciation is merely collateral to a primary purpose of farming, courts have permitted unrealized appreciation to be considered as part of an overall intent to profit from the property, irrespective of the amount of income from farming.  See, e.g., Engdahl v. Commissioner, supra at 668 & n.4, 669; Hoyle v. Commissioner, supra; Ellis v. Commissioner, supra.

In the present matter, the same result is obtained regardless of whether petitioner's ranch land was held primarily

for appreciation or for farming. If appreciation was the dominant motive, the activities cannot be considered together because income from ranching did not exceed deductions. For the 1992 through 1995 years at issue, the ranch generated $0 in gross income. As deductions directly attributable to ranch operations exceeded this figure in all 4 years, ranching did not reduce the net cost of carrying the land.

Likewise, even if farming was the primary objective, a claimed expectation of appreciation cannot help petitioners. Because no appraisal or value of the ranch was offered as evidence, it is impossible to determine the extent to which losses may have been offset by such appreciation. Furthermore, even if we were to accept petitioner's uncorroborated estimate of a 30 to 40 percent area-wide increase in value, the resulting amount would be insufficient to establish a legitimate expectation to profit from the property. Since the losses through 1997 total $155,702, they exceed the original purchase price of $145,000 for parcel 2. Petitioner would have needed to expect more than a 100 percent appreciation to recoup his losses.

5. The success of the taxpayer in carrying on other similar or dissimilar activities.

As stated in section 1.183-2(b)(5), Income Tax Regs.: "The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present

activity for profit".  Here, petitioner previously started a computer service business, SRMC, and brought it to the point of achieving over $2 million in gross income.  However, given the marked differences between petitioner's history at SRMC and his ranching venture, general business acumen carries little probative weight on these facts.  Prior to forming SRMC, petitioner had gained experience with computer systems through his previous employment at Digital Equipment Corporation.  Prior to purchasing his land, petitioner had virtually no experience with cattle ranching.  In addition, to create a profitable enterprise through full-time efforts is one thing; to dabble several days a month is quite another.  Moreover, SRMC has now gone from profitable to unprofitable during petitioner's tenure.

Based on these differences, an observation by the Court in Haladay v. Commissioner, T.C. Memo. 1990-45, would seem equally appropriate here: "The wholesale sporting goods business is sufficiently dissimilar from farming that even if Raymond's Midway business had been a consistently profitable one, a conclusion that the farming activity should have been equally profitable would not be warranted."  The admonition by the Court in Dodge v. Commissioner, T.C. Memo. 1998-89, that the taxpayers there "did not show that their acquired business expertise was

used in the horse activity" is likewise warranted.  Petitioner's experiences in the high-tech arena simply did not translate meaningfully into his cattle-ranching operations.

6. The taxpayer's history of income or losses with respect to the activity.

According to section 1.183-2(b)(6), Income Tax Regs., losses that "continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status" may be indicative of a lack of profit objective. Exceptions exist for losses due to "customary business risks or reverses" and "unforeseen or fortuitous circumstances which are beyond the control of the taxpayer".  Id.  Here, it is undisputed that petitioner's ranch has never generated a profit in the 8 years from their first land purchase in 1990 through 1997. Losses were incurred in each of the years at issue.  Moreover, the profit petitioners claim for 1998 is attributable to a $33,000 consulting fee paid to petitioner by a neighbor for help in planning and building a ranch.  The cattle operations themselves continued to show a loss even in 1998.

Although no evidence was presented as to the customary startup period for a cattle ranch, 7 or 8 years would seem excessive.  Petitioner, however, asserts that his losses should nonetheless be excused as attributable to unforeseen circumstances and casualties.  He points to a hurricane damaging other property held in Hawaii, the calling of a bank loan with

respect to the SRMC business, and drought conditions in the area of the ranch as responsible for his continued losses. We disagree that these circumstances are sufficient to justify the lengthy period of losses at issue.

The hurricane and the SRMC misfortunes are only tangentially related to the ranching enterprise. In addition, the hurricane damage was resolved within a relatively short period, impacting only the winter of 1992-93, so cannot explain the many years of losses. As to SRMC's reverses, since petitioner's level of involvement in ranch affairs prior to the 1993 corporate problems does not appear to differ significantly from his subsequent activities, the SRMC hardships are a less than convincing reason for losses at the ranch.

The alleged drought, too, falls short of offering a legitimate excuse. Petitioner testified that he learned of the dry conditions after he bought parcel 1 in 1990, so the lack of rainfall was hardly unforeseen when parcel 2 was purchased in 1992. Prior to the years at issue, petitioner should have been aware of the need to plan for such conditions if he truly intended to make a profit from his property. As of early 1999, an irrigation system was still not in place on the property.

7. The amount of occasional profits, if any, which are earned.

As indicated above, petitioner has earned no profits from his cattle-ranching operations, apart from the 1998 consulting fee, so this factor does little to substantiate his intent.

8. The financial status of the taxpayer.

Section 1.183-2(b)(8), Income Tax Regs., explains this factor as follows: "Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit". Here, at the time petitioner purchased both parcel 1 and parcel 2, he had adjusted gross income of over $400,000. His income remained above the six-figure mark through 1994. Given this significant level of income, it would not be unreasonable to conclude that making a profit was not petitioner's primary concern when he began his cattle-ranching venture. The fact that petitioner has continued his operations despite his decrease in income could offer support for a contrary view, but his failure to make significant changes to increase profitability belies this notion, at least with respect to the years in issue.

9. Elements of personal pleasure or recreation.

Underlying this final factor is the premise that:

The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. On the other hand, a

> profit motivation may be indicated where an activity lacks any appeal other than profit. [Sec. 1.183-2(b)(9), Income Tax Regs.]

In the case of a ranching endeavor such as petitioner's, however, this consideration does not weigh strongly either for or against intent to profit. Aspects of potential enjoyment coexist with aspects of demanding labor. As observed by the Court in <u>Barter v. Commissioner</u>, T.C. Memo. 1991-124, affd. without published opinion 980 F.2d 736 (9th Cir. 1992): "While we agree with petitioner fixing fences and dragging roads is not in and of itself pleasurable, petitioner did glean some pleasure from the ranch * * * and petitioner received the <u>personal</u> gain of building and maintaining what was to be his retirement home." Similarly, petitioner here engaged in toilsome work such as ripping soil for planting, but he also testified that he embarked upon cattle ranching in part because he desired to slow down his lifestyle. Hence, despite the presence of difficult tasks, a personal motive was an instigator for the venture. As a result, this factor does little to either advance or detract from petitioner's position.

In summary, the circumstances of these cases, when considered within the framework of the nine factors above, indicate that petitioner did not possess the requisite intent to profit from his cattle-ranching operations. Petitioners therefore are subject to the restrictions set forth in section 183 and improperly deducted losses.

## Application - Aircraft Rental

Turning then to whether petitioner intended to make a profit through the rental of his personal aircraft, analysis of the surrounding circumstances again establishes that he did not. Although the parties presented far less evidence and argumentation on this issue than with respect to the ranch, those of the nine factors to which the record does speak fail to paint the picture of a profit-driven enterprise.

First, regarding businesslike manner, petitioner did not testify to maintaining books and records for his rental operations that would allow either for regular and meaningful evaluation of the enterprise's financial health or for the making of informed business decisions.  On the contrary, the only business decision addressed by the parties at trial or on brief appears to have been made in a strikingly unbusinesslike manner. Petitioner set the rate he charged for use of his aircraft by calling other businesses, inquiring what they charged, and establishing a comparable fee.  He seems to have undertaken no analysis whatsoever of his own expenses, his probable balance of rental versus personal use, or his likely break-even point.  It is doubtful that most serious entrepreneurs would simply charge what competitors charge without ever calculating whether their

business could stay afloat at that price level.  As was the case with the cattle ranch, turning a profit while employing such techniques would best be characterized as merely fortuitous.

Next, as to expertise, there again appears to have been no basic investigation of the economic aspects of the business. There also was no evidence that petitioner had any experience in the rental of airplanes.

Furthermore, the time and effort expended by petitioner on his rental business was negligible.  No advertising or marketing was undertaken.  The plane was rented only to petitioner's own business, SRMC.  Moreover, between 65 and 75 percent of the plane's total usage, for the years as to which losses were disallowed, was by petitioner for traveling to and from his ranch.  With such a comparatively small amount of time available for rental, a bona fide intention to profit seems rather far-fetched.

In addition, no appreciation could have been expected because vehicles, including aircraft, typically depreciate rather than increase in value.

The only factors weighing to any significant degree in favor of a profit motive are those addressing history of losses and occasional profits.  Losses were reported in 1990, 1992, 1993, and 1997, but petitioner's aircraft-rental operations earned a profit in 1991, 1994, 1995, and 1996.  Such profits could be

indicative of the requisite intent.  Nonetheless, because of the complete absence of evidence to show that the profits resulted from any conscious efforts or calculation on the part of petitioner, the apparent fortuitous nature of the positive returns is not overcome.

The financial status factor is likewise not supportive of petitioner's claims.  Adjusted gross income from other sources totaled over $300,000 in both of the years for which losses were disallowed.  Petitioner could afford and benefit taxwise from the loss.

Finally, it is unlikely that petitioner owned, maintained, and flew a personal aircraft without finding some pleasure in the activity.  Also, the much greater percentage of time that the aircraft was devoted to personal rather than business use (given that the ranch failed to qualify as a business) indicates that personal motives predominated over profit motives.  Thus, as with the cattle-ranching enterprise, section 183 precludes petitioners from deducting losses related to the aircraft-rental business.  Respondent's determinations of deficiencies are therefore sustained as to both activities.

## Penalty Issue

The final issue we must decide is whether petitioners are liable, as respondent contends, for accuracy-related penalties based on negligence.  Section 6662(a) and (b)(1) imposes an

accuracy-related penalty in the amount of 20 percent of any underpayment that is attributable to negligence or disregard of rules or regulations. "Negligence" is defined in section 6662(c) as "any failure to make a reasonable attempt to comply with the provisions of this title", and "disregard" as "any careless, reckless, or intentional disregard." Section 1.6662-3(b)(1), Income Tax Regs., further explains: "Negligence is strongly indicated where-- * * * (ii) A taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances". Case law similarly states that negligence is "the failure to exercise the due care of a reasonable and ordinarily prudent person under like circumstances." Sanders v. Commissioner, T.C. Memo. 1999-208; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985). The taxpayer bears the burden of establishing that he or she was not negligent, had reasonable cause for the underpayment, and acted in good faith. See sec. 6664(c)(1); Neely v. Commissioner, supra at 947; Sanders v. Commissioner, supra.

Here, petitioners do not aver any specific facts to rebut respondent's finding of negligence other than that the amounts reported were uncontested. This assertion fails to meet petitioners' burden of showing that the treatment of these

amounts was reasonable and in good faith.  Deducting over $117,000 without further investigation would also appear to fall short of the prudence standard.  Accordingly, respondent's determination of section 6662 penalties is sustained.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.