2008 UT 34

Dennis MANDELL and Kathy Mandell, Petitioners,

v.

AUDITING DIVISION OF the UTAH STATE TAX COMMISSION, Respondent.

No. 20060521.

Supreme Court of Utah.

May 23, 2008.

---

David W. Scofield, Thomas W. Peters, Salt Lake City, for petitioners.

Mark L. Shurtleff, Att'y Gen., Timothy A. Bodily, Asst. Att'y Gen., Salt Lake City, for respondent.

PARRISH, Justice:

## INTRODUCTION

¶ 1 This petition for review asks us to determine whether the state of Utah has the authority to tax the proceeds of a settlement received by Dennis Mandell and his wife, Kathy (the "Mandells"). The settlement resolved a lawsuit that Dennis Mandell ("Mandell") filed in Nevada some two years after he and Kathy moved from Utah. The Auditing Division of the Utah State Tax Commission (the "Auditing Division") determined that the settlement proceeds were taxable because they related to the sale of assets of an S corporation doing business in Utah. As a result, the Auditing Division assessed a delinquency on the 2001 joint tax return filed by the Mandells. The Mandells unsuccessfully appealed that determination to the Utah State Tax Commission (the "Commission") and then filed a petition for review with this court. We affirm the Commission's determi-

nation. The settlement proceeds were paid in lieu of proceeds that Mandell should have received from the sale of assets of a Utah corporation. Because the proceeds of the original sale were taxable, the settlement is also taxable.

## BACKGROUND

¶ 2 The Mandells were residents of Utah from 1995 to March 1999. During that time, Dennis Mandell was the manager and a 20% shareholder of Homes America of Utah, Inc. ("HAU"), a company that sold mobile homes in Utah. HAU filed as a subchapter S corporation for federal income tax purposes. In addition to Mandell, HAU had two other shareholders: Gerald Meyer owned 20% and Eugene Whitworth ("Whitworth") owned 60%.

¶ 3 Whitworth also controlled eight other corporations that were in the business of selling mobile homes. These other corporations operated in Nevada, Arizona, Idaho, Oklahoma, California, and Oregon. In 1998, Whitworth agreed to sell all nine corporations to Champion Homes, Inc. ("Champion") for an aggregate purchase price of $102.5 million. Of the aggregate purchase price, Champion paid $67.5 million in cash, with $5 million held in reserve for eighteen months to cover unknown liabilities. The remaining $30 million was payable contingent upon the combined future earnings of the corporations. Whitworth used his discretion to allocate the aggregate purchase price among the nine corporations. The sale was consummated on March 27, 1998, but the contingent component of the purchase price was never realized.

¶ 4 Mandell and the other shareholders of HAU elected to treat the sale as a "deemed asset sale" by filing an election under section 338(h)(10) of the Internal Revenue Code (the "section 338 election"). As a result, the transaction was treated for tax purposes as though HAU had sold assets and distributed the sale proceeds to its shareholders. *See* I.R.C. § 338(h)(10) (2000). The shareholders in the other eight Whitworth corporations similarly made section 338 elections. HAU

reported the gain from the sale as business income apportioned 100% to Utah on its 1998 Utah income tax returns. It also identified Utah as its "commercial domicile."

¶ 5 In 1999, approximately one year after the sale of HAU, the Mandells moved to Nevada. Shortly thereafter, Mandell discovered that Whitworth had defrauded him in connection with the sale by characterizing the sale proceeds in a manner that disproportionately benefitted Whitworth. Whitworth allocated between 80% and 100% of the cash component to those corporations that he wholly owned, while allocating a higher percentage of the contingent payments to those corporations with minority shareholders. As a result of this disparate allocation, Whitworth was able to substantially underpay the minority shareholders.

¶ 6 For example, Whitworth allocated $8.105 million of the total $102.5 million purchase price to the sale of HAU. Of this allocation, however, only 38% (or $3.105 million) was paid through the cash component of the purchase price, with 62% (or $5 million) deferred as an unrealized contingency. This meant that Mandell received only $621,000, instead of approximately $1.67 million he would have received had the various components of the purchase price (i.e., cash, deferred, and contingent payments) been proportionately distributed among the various corporations.

¶ 7 After discovering Whitworth's underpayment, Mandell filed suit in a Nevada state court against Whitworth's estate.[1] Mandell's complaint alleged that Whitworth had inflated the values of the corporations of which he was the sole shareholder or in which he owned a relatively large percentage of shares, thereby artificially decreasing the value of Mandell's ownership in HAU. Mandell sought imposition of a constructive trust on the misallocated sales proceeds. He also requested general damages, attorney fees, and interest on the amounts due.

¶ 8 Whitworth and Mandell settled the Nevada lawsuit in 2001. In return for a settlement payment, Mandell and his wife, Kathy,

---

1. Whitworth passed away in November 1998. Because the fact of Whitworth's death is not material to our analysis, we will refer to Whitworth's estate simply as "Whitworth."

released and discharged all claims alleged in the complaint. The Mandells received $1,127,977 through the settlement, which increased the total amount that Mandell received from the sale of HAU to $1,748,077—approximately $78,000 more than the principal amount Mandell should have received originally. The parties documented their settlement in a "Confidential Settlement Agreement."

¶ 9 The way the parties characterized their settlement is important. On their federal income tax return, the Mandells reported the settlement proceeds as a long-term capital gain from the sale of Mandell's "20% stock interest of [HAU], sold on 9/15/01." The Mandells' accountant, Kenneth Stieha, explained that the settlement was reported as capital gain (not ordinary income) on the Mandells' 2001 federal income tax return because the proceeds related back to the initial sale of HAU and the section 338 election. Whitworth similarly treated the settlement as an adjustment to the HAU sale, seeking reimbursement under a claim of right credit on his 2001 federal income tax return by offsetting the settlement proceeds paid to the Mandells against the income reported from the sale in 1998. Whitworth also attempted to file an amended 1998 Utah state income tax return—reducing the gain recognized from the sale of his stock in HAU by the amount of the settlement paid to the Mandells in 2001. Although the Commission initially challenged Whitworth's position, the Commission and Whitworth eventually reached a settlement.

¶ 10 In 2003, the Auditing Division assessed a deficiency on the Mandells' 2001 tax return for $70,129.62, as well as penalties of $14,025.92 and interest amounting to $6,148.00. The Mandells appealed. On appeal, the Commission waived the penalties but upheld the deficiency, after finding that the settlement was paid in lieu of proceeds Mandell should have received from the original sale. The Mandells thereafter petitioned this court for review of the Commission's decision. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(e)(ii) (2008).

## STANDARD OF REVIEW

¶ 11 When reviewing the Commission's formal adjudicative proceedings, we grant no deference to the Commission's conclusions of law, reviewing them for correctness. Utah Code Ann. § 59–1–610(1)(b) (2006); see also Kennecott Corp. v. State Tax Comm'n, 858 P.2d 1381, 1383 (Utah 1993). We do, however, grant deference to the Commission's written findings of fact, applying the "substantial evidence standard" on review. Utah Code Ann. § 59–1–610(1)(a).

¶ 12 Our standard of review for mixed questions of law and fact varies "according to the nature of the legal concept at issue." State v. Levin, 2006 UT 50, ¶ 21, 144 P.3d 1096. To determine the standard of review for a mixed question of law and fact, we apply a test that considers (1) the complexity of the facts; (2) the degree to which the lower court relied on observable facts that cannot be adequately reflected in the record, such as witness demeanor and appearance; and (3) any policy reasons favoring or disfavoring the exercise of discretion. Id. ¶ 25.

## ANALYSIS

¶ 13 The Mandells characterize the 2000 lawsuit as a chose-in-action litigated entirely in Nevada, deriving from a fraud that occurred in California. Because they were not Utah residents at the time of the 2001 settlement, the Mandells contend that Utah lacks jurisdiction to tax the settlement proceeds.

¶ 14 The fact that the Mandells had no personal, commercial, or business presence in Utah in 2001 does not render them immune from taxation by the state of Utah. "[T]he power to promulgate and enforce income tax laws is an essential attribute of sovereignty." Franchise Tax Bd. v. Hyatt, 538 U.S. 488, 498, 123 S.Ct. 1683, 155 L.Ed.2d 702 (2003) (citing Franchise Tax Bd. v. U.S. Postal Serv., 467 U.S. 512, 523, 104 S.Ct. 2549, 81 L.Ed.2d 446 (1984)). In order to tax, a state must show only "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." Miller Bros. Co. v. Maryland, 347 U.S. 340, 344–45, 74 S.Ct. 535, 98 L.Ed. 744 (1954). Among other things, "in-

corporation by a state or permission to do business there forms the basis for proportionate taxation of a company." *Id.* at 345, 74 S.Ct. 535 (footnotes omitted).

¶ 15 The Mandells' claim that Utah lacks authority to tax their settlement proceeds presents an issue of first impression in Utah. Other courts, however, have had ample opportunity to determine a state's authority to tax settlement proceeds or damages received through litigation. These courts uniformly look to the character and nature of the settlement proceeds or damages to determine their taxability, asking "in lieu of what were the damages awarded"? *See, e.g., Dye v. United States,* 121 F.3d 1399, 1404, 1409 (10th Cir.1997); *Alexander v. IRS,* 72 F.3d 938, 942 (1st Cir.1995); *Gail v. United States,* 58 F.3d 580, 582 (10th Cir.1995); *Raytheon Prod. Corp. v. Comm'r,* 144 F.2d 110, 113 (1st Cir.1944); *Connolly v. Comm'r,* 93 T.C.M. (CCH) 1138, 1139 (2007); *Pennzoil Co. v. Dep't of Revenue,* 332 Or. 542, 33 P.3d 314, 317 (2001). This test recognizes that where profits would be subject to taxation, "the proceeds of litigation which are their substitute are taxable in like manner." *Raytheon,* 144 F.2d at 113.

¶ 16 In light of persuasive case law from other jurisdictions, we hold that the Commission appropriately adopted and applied the "in lieu of" test to determine the true character and nature of the settlement proceeds. We further hold that the Commission appropriately concluded that the proceeds at issue were received in lieu of sale proceeds that were taxable by the state of Utah.

I. UNDER THE "IN LIEU OF" TEST, THE SETTLEMENT PROCEEDS RELATE TO THE ORIGINAL SALE OF HAU, WHICH WAS SUBJECT TO UTAH TAX

A. *Determining the Character and Nature of the Settlement Proceeds Presents a Mixed Question of Law and Fact*

¶ 17 Determining the true character and nature of the settlement proceeds presents a mixed question of law and fact, not a mere question of fact as the Division suggests. Because the determination of the character and nature of such proceeds is typically outcome determinative, it deserves a more thorough review than clear error. *Cf. Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500–01, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (according less deferential review to findings of "ultimate facts" which "may determine the outcome of litigation").

¶ 18 In *State v. Levin,* we set out a policy-based balancing test for determining the amount of deference that appellate courts should pay to trial courts when reviewing mixed questions of law and fact. 2006 UT 50, ¶ 25, 144 P.3d 1096. The tripartite test considers (1) the complexity of the facts; (2) the degree to which the trial court relied on observable facts that cannot be reflected adequately in the record, such as witness demeanor and appearance; and (3) policy reasons that favor the exercise of discretion by the lower courts. *Id.* ¶ 25.

¶ 19 In this case, all three factors favor application of a less deferential standard of review. First, the facts are straightforward and uncomplicated. Second, they are reviewable from the cold record, requiring little reliance on witness demeanor. For example, the nature of the allegations in the underlying lawsuit, Whitworth's assertion of the claim of right, and the Mandells' characterization of the settlement proceeds on their 2001 federal income tax return are all facts memorialized in a written record. Third, although we are not aware of a particular demand for consistency in this area of the law, other policy reasons support a less deferential standard of review. Most importantly, application of the "in lieu of" test implicates due process because it is the state's jurisdictional hook for taxing the Mandells' settlement proceeds.

¶ 20 We conclude that the character and nature of a settlement or judgment under the "in lieu of" test presents a mixed question of law and fact and that the three *Levin* factors weigh in favor of according less deference to the Commission's application of the law to the facts. A finding of fact may occasionally be

inseparable from the principles through which it was deduced. At some point, the

reasoning by which a fact is "found" crosses the line between application of those ordinary principles of logic and common experience ... into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment.

*Bose Corp.*, 466 U.S. at 501 n. 17, 104 S.Ct. 1949.

¶ 21 With the appropriate standard of review in mind, we proceed to the two-step analysis pursuant to which we determine whether there is a sufficient connection for Utah to tax the settlement proceeds. We first determine the character and nature of the settlement proceeds by asking, "In lieu of" what was the settlement paid? *See, e.g., Dye v. United States*, 121 F.3d 1399, 1409 (10th Cir.1997); *Pennzoil Co. v. Dep't of Revenue*, 332 Or. 542, 33 P.3d 314, 317 (2001). Once we have determined the character and nature of the settlement, we then analyze whether it constitutes income taxable by the state of Utah.

### B. Applying the "In Lieu of" Test Demonstrates That the Settlement Related to the Original Sale of HAU

■■ ¶ 22 Because the taxability of a settlement or judgment is dependent upon the underlying transaction or claim, we apply the "in lieu of" test to determine what the settlement proceeds or damages replaced. Although Utah courts have yet to apply the test, a host of cases from other jurisdictions provide guidance as to the relevant factors. Specifically, we consider the intent of the parties as indicated by express language in the settlement agreement or by circumstances surrounding the settlement, the parties' own characterization of the settlement proceeds, the language of the complaint, and the amount of the settlement. We apply these factors to this case by looking at Whitworth's apparent intent in settling the claim, Mandell's own characterization of the suit, the Mandells' treatment of the settlement proceeds, and the amount of the settlement.

### 1. Whitworth's Intent in Settling the Claim

¶ 23 The intent of the payor in settling a claim is one of the most important considerations in determining the underlying nature of a settlement. *See Knuckles v. Comm'r*, 349 F.2d 610, 613 (10th Cir.1965) (holding that settlement proceeds were not for personal injury claim where the payor did not acknowledge possible liability for personal injury and in fact consistently denied such liability); *Hawkins v. Comm'r*, 94 T.C.M. (CCH) 310, 312 (2007) ("We determine the reason for the settlement payment by ascertaining the intent of the payor in making the payment.").

¶ 24 Typically, the intent of the payor is determined from the language of the settlement agreement. In this case, however, the settlement agreement was confidential. The parties have not provided us with complete copies of the settlement, and the portion contained in the record is silent as to Whitworth's intent. In such cases, other courts have looked to the factual circumstances surrounding the settlement to determine the payor's intent. *See, e.g., Gibson v. Comm'r*, 94 T.C.M. (CCH) 164, 167 (2007); *Connolly v. Comm'r*, 93 T.C.M. (CCH) 1138, 1140 (2007).

¶ 25 In this case, Whitworth's tax filings indicate that Whitworth intended the settlement to compensate the Mandells for amounts wrongfully withheld in connection with the original sale of HAU. Whitworth asserted a claim of right[2] on his 2001 federal income tax return.[3] The claim of right

2. A claim of right deduction is allowed when, after a previous payment of taxes on an income amount in a prior year, the taxpayer discovers in a later year that the income amount was actually lower than previously thought. Because the taxpayer has been overtaxed, the taxpayer files for a refund based on overpayment when the mistake or error comes to light. *See* I.R.C. § 1341(a) (2000).

3. The Mandells argue that Whitworth should not have been entitled to a federal claim of right

deduction due to fraud. *See Kraft v. United States*, 991 F.2d 292 (6th Cir.1993). We, however, are not concerned with the validity of Whitworth's claim of right deduction—only his state of mind. And the fact that the settlement prompted Whitworth to file a claim of right to adjust the amount of the proceeds subject to tax in connection with the original sale indicates that the settlement was intended to reflect an adjustment in the amount of the sale proceeds to which

sought reimbursement for the tax that Whitworth paid in 1998 on the inflated amount he received in connection with the original sale. Whitworth sought a similar adjustment from the state of Utah. Whitworth's assertion of these claims reflects his intention that the settlement reimburse the Mandells for proceeds that Mandell should have received in connection with the original sale.

### 2. Mandell's Own Characterization of the Suit [4]

¶ 26 Another factor often considered in determining the character of settlement proceeds obtained through litigation is the language of the underlying complaint. *See Elliott v. Comm'r*, 53 T.C.M. (CCH) 1302, 1304 (1987) (considering a plaintiff's characterization in the complaint in concluding that settlement was for lost profits); *see also Villaume v. United States*, 616 F.Supp. 185, 189 (D.Minn.1985) (rejecting argument that settlement received was for personal injuries because the complaint in state court "contained no indication that the suit was intended to recover damages for personal injuries"); *Estate of Taracido v. Comm'r*, 72 T.C. 1014, 1022 (1979) ("[T]he proper test to be applied ... is that the tax character of the settlement proceeds is determined by the nature of the claims involved and the basis of the recovery."). In cases where the underlying lawsuit has advanced to trial, courts have also looked at evidence introduced and arguments made at trial. *See Church v. Comm'r*, 80 T.C. 1104, 1107 (1983); *see also State Fish Corp. v. Comm'r*, 48 T.C. 465, 474–76 (1967), *clarified by* 49 T.C. 13 (1967).

¶ 27 Mandell's complaint and the documents filed in connection with his motion for summary judgment demonstrate that Mandell filed suit for the purpose of recovering the proceeds that he should have received from the 1998 sale of HAU. The complaint states:

[Mandell has] discovered that the allocations of the purchase price fixed by [Whitworth] for each corporation were not based

upon the actual values of each corporation compared to the total purchase price offered by [Champion]. Instead, [Whitworth's] allocations inflated the values of those companies that he exclusively owned or where he had a larger percentage of ownership. These allocations decreased the true value of [Mandell's] ownership in [HAU].

The complaint further alleges:

[Whitworth] also allocated a substantially larger percentage of the cash portion of the purchase price to himself as compared to the cash paid to [Mandell]. [Mandell was] left relying upon achieving the uncertain performance criteria for the bulk of [his] allocated purchase price.

¶ 28 Similarly, in connection with his motion for summary judgment, Mandell alleged that "Whitworth's actions caused him to sell his interests at a value substantially below their fair and equitable share of the purchase price paid by Champion. In addition Whitworth paid himself a disproportionate share of the cash portion of the sales price."

¶ 29 In short, it is clear from the language of the complaint and documents filed in connection with Mandell's motion for summary judgment that Mandell sought reimbursement for the misallocated HAU sale proceeds. Although the complaint states causes of action for breach of fiduciary duties, fraud, undue influence, and unjust enrichment, the primary relief it requests is a constructive trust on the funds that Whitworth received by disproportionately allocating the sale proceeds.

### 3. Other Factors Demonstrating the Parties' Intent Regarding the Settlement Proceeds

¶ 30 Other evidence also indicates that the Mandells viewed the settlement proceeds as income from the sale of HAU. The first such evidence is the Mandells' treatment of the proceeds on their 2001 federal income tax return, on which they reported the settle-

---

Mandell was entitled in connection with the original sale.

**4.** Only Mandell was a party to the lawsuit. Nevertheless, both Dennis and Kathy signed the set-

tlement agreement. Accordingly, we refer to the Mandells' settlement proceeds, but to Mandell's lawsuit or proceeds that Mandell should have received from the sale.

ment as a long-term capital gain on the sale of Mandell's 20% interest in HAU. Similarly, the testimony of the accountant who prepared the return established that the settlement proceeds were treated as capital gains, rather than ordinary income, because they were earnings from the deemed asset sale in 1998.

¶ 31 The second such evidence is the amount of the settlement payment. The settlement amount is similar to the amount Mandell would have received in 1998 had Whitworth paid the amount Mandell contends was owing. While Mandell should have received $1,671,000 from the original sale of HAU, he received only $621,000. The settlement proceeds of $1,127,977 increased the total proceeds received to $1,748,977, just slightly more than the amount to which Mandell was originally entitled. This similarity between the two amounts further suggests that the proceeds were received in lieu of amounts payable in connection with the original sale of HAU. *See Sager Glove Corp. v. Comm'r,* 311 F.2d 210, 212 (7th Cir.1962) (considering fact that recovery sought for lost profits "closely approximated the settlement amount" in determining the character and nature of the settlement).

¶ 32 In summary, having applied the "in lieu of" test, we conclude that the settlement proceeds were paid in lieu of the funds that Mandell should have received from the 1998 sale of HAU. The Mandells' attempt to distinguish the settlement proceeds from the original sale is unavailing. Whitworth's apparent intent, Mandell's characterization of his claim in the underlying litigation, the Mandells' treatment of the settlement on their federal income tax return, and the amount of the settlement are all consistent with the Commission's determination that the settlement was paid to reimburse the Mandells for the proceeds Mandell should have received in connection with the original sale of HAU.

## II. UTAH HAS STATUTORY AUTHORITY TO TAX THE SETTLEMENT BECAUSE IT WAS RECEIVED IN LIEU OF PROCEEDS FROM THE SALE OF UTAH ASSETS

¶ 33 Having determined that the settlement proceeds were received in lieu of proceeds that Mandell should have received from the sale of HAU, we now consider whether the state of Utah had authority to tax the proceeds of the original sale. The Commission's decision offered three statutory sources of authority to tax the sale proceeds, but even one source of authority is sufficient. We hold that Utah had authority to tax the proceeds of the original sale because those proceeds fall within the statutory definition of Utah source income.

¶ 34 Utah has authority to tax all Utah source income. Utah source income is income derived from or connected to the state. *See* Utah Code Ann. § 59–10–117 (2006). A corporation is deemed to have subjected itself to Utah state taxing authority in return "for the privilege of exercising its corporate franchise or for the privilege of doing business in the state." *Id.* § 59–7–104(1). Consistent with this principle, the state of Utah possesses the authority to tax nonresidents for the portion of their income derived from Utah sources. *See id.* §§ 59–10–116, –117.

¶ 35 When a corporation is organized as an S corporation for federal income tax purposes, the income it earns is passed through and taxed to the shareholders based on their proportionate share of ownership. *See* I.R.C. §§ 1363, 1366 (2000); *Robinson v. United States,* 335 F.3d 1365, 1366 (Fed.Cir. 2003) ("The tax consequences of an S-corporation flow through to the shareholders, so the shareholders recognize the corporation's income and expenses on their individual tax returns."). For purposes of determining whether this passed-through income is taxable, the character of the income remains the same as it was when in the hands of the corporation. *See* I.R.C. § 1366(b). Because Utah taxes S corporations in the same manner as they are taxed for federal tax purposes, a nonresident shareholder of an S corporation must pay taxes on the portion of an S corporation's taxable income derived from Utah sources. Utah Code Ann. §§ 59–7–701, –702(2)(b).

¶ 36 The proceeds from the sale of HAU constituted Utah source income. HAU was

an S corporation doing all of its business in Utah. Thus, all of the income received by HAU in the ordinary course of business, which was passed through to its shareholders, was derived from Utah sources.

¶ 37 The structure of the HAU sale further demonstrates that the sale proceeds were Utah source income. All of HAU's shareholders elected to characterize the sale as a deemed asset sale under I.R.C. § 338(h)(10). As a result, the gains realized through the sale were taxable as if the corporation had sold assets rather than stock. *See id.* § 338(h)(10). The gains from the sale passed through to the shareholders, who bore the responsibility of paying taxes on those gains in proportion to their ownership interests. *See id.* § 1366(b); *see also* Utah Code Ann. § 59–7–701. The gains recognized from this deemed asset sale constitute Utah source income under Utah Code sections 59–10–118(1)(a), which defines business income, and 59–7–114(4), which creates a rebuttable presumption that the gain on a deemed sale of assets under a section 338 election constitutes business income.[5] They are therefore taxable under Utah Code section 59–10–117(2)(d).

¶ 38 Because the 2001 settlement proceeds were received in lieu of the original sale proceeds and because the original sale proceeds were taxable as Utah source income, the settlement proceeds are also taxable as Utah source income. And they remain taxable whether or not the shareholders are residents of Utah.

¶ 39 Case law supports the right of a state to tax a nonresident shareholder on the income of an S corporation derived from that state. For example, in *Isaacson v. Iowa State Tax Commission,* Nebraska residents, who were shareholders of an Iowa S corporation that conducted all of its business in Iowa, challenged Iowa's authority to tax the corporate income that passed through to them. 183 N.W.2d 693, 693–94 (Iowa 1971). During the years for which the Isaacsons were taxed in Iowa, the Isaacsons conducted

no business or trade activities there. *Id.* at 694. Construing statutes similar to those at issue here, the Iowa Supreme Court held that Iowa could tax the S corporation's dividends received by the nonresident Isaacsons. *Id.* at 695. Other courts have decided this issue similarly. *See, e.g., Valentino v. Franchise Tax Bd.,* 87 Cal.App.4th 1284, 105 Cal. Rptr.2d 304 (2001) (holding that S corporation shareholders are liable for California taxes based on the income earned by the S corporation through income producing activities within the state); *Gen. Accessory Mfg. Co. v. Okla. Tax Comm'n,* 2005 OK CIV APP 75, ¶ 13, 122 P.3d 476, 480 (holding that nonresident stockholders who made a section 338 election in the sale of their stock were liable for Oklahoma income tax because the corporation was domiciled in the state and derived all of its income from sources within the state); *Kulick v. Dep't of Revenue,* 290 Or. 507, 624 P.2d 93, 98–99 (1981) (holding that Oregon could constitutionally tax personal income of a nonresident shareholder of an S corporation based on distributed and undistributed income).

¶ 40 In summary, the settlement proceeds are taxable by Utah because they relate to the sale of Utah assets. Gains received from such a sale are clearly taxable under the Utah Code. It is of no import that the Mandells did not receive the sale proceeds until after they moved to Nevada because Utah may tax the income of nonresidents if that income is derived from this state.

## III. THE DEFICIENCY ASSESSED AGAINST THE MANDELLS DOES NOT VIOLATE THE UNITED STATES CONSTITUTION

¶ 41 The Mandells argue that Utah's taxation of the settlement proceeds violates the United States Constitution. When challenging the authority of a state to impose a tax, "[t]he party attacking the constitutionality of a statute has the burden of affirmatively demonstrating that the statute

5. Under the Utah Code, there is a rebuttable presumption that the gain from a deemed asset sale constitutes business income. Utah Code Ann. § 59–7–114(4). The Mandells cannot rebut this presumption because when HAU initially

reported the sale, it characterized the sale as business income 100% apportioned to Utah. Thus, the proceeds received by Mandell from the sale of HAU were initially taxable as business income.

is unconstitutional. Moreover, there is a strong presumption that tax statutes are constitutional." *Kennecott Corp. v. State Tax Comm'n,* 858 P.2d 1381, 1384 (Utah 1993) (footnotes omitted). The United States Supreme Court has recognized that "the taxpayer has the distinct burden of showing by clear and cogent evidence that [the state tax] results in extraterritorial values being taxed."[6] *Container Corp. of Am. v. Franchise Tax Bd.,* 463 U.S. 159, 164, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (internal quotation omitted).

¶ 42 States have broad constitutional authority to impose taxes on transactions within their borders, but no state has authority to "tax value earned outside its borders." *ASARCO, Inc. v. Idaho Tax Comm'n,* 458 U.S. 307, 315, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982). In *Wisconsin v. J.C. Penney Co.,* the Supreme Court noted that

> [a] state is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly, civilized society.

311 U.S. 435, 444, 61 S.Ct. 246, 85 L.Ed. 267 (1940). The Court went on to note that "[t]he substantial privilege of carrying on business" within state borders "clearly supports" taxation. *Id.* at 444–45, 61 S.Ct. 246.

¶ 43 The Mandells first challenge Utah's taxing authority under the Due Process Clause of the United States Constitution. To withstand a due process challenge to the imposition of a tax, a "definite link" or "minimum connection" must exist between the state and the person, property, or transaction sought to be taxed. *See Allied–Signal, Inc. v. Dir., Div. of Taxation,* 504 U.S. 768, 777, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992) (internal quotations omitted). A deemed asset sale of a Utah S corporation that does all of its business within Utah provides a sufficient link or connection for Utah to constitutionally assert taxing juris-

diction over a nonresident shareholder of that corporation. As previously discussed, courts have consistently affirmed the right of states to tax nonresident shareholders of S corporations for business transactions conducted within the taxing state. Moreover, it is inappropriate to characterize the taxing authority of a state as equivalent to the jurisdictional authority of the state. *See J.C. Penney Co.,* 311 U.S. at 445, 61 S.Ct. 246 ("We must be on guard against imprisoning the taxing power of the states within formulas that are not compelled by the Constitution but merely represent judicial generalizations exceeding the concrete circumstances which they profess to summarize."). As the Supreme Court declared, "if [a state] has jurisdiction of [a taxpayer's] taxable property or transactions, it may sometimes, through these, reach the nonresident." *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 343, 74 S.Ct. 535, 98 L.Ed. 744 (1954).

¶ 44 The Mandells also contend that Utah's taxation of the settlement proceeds violates the Commerce Clause and the Privileges and Immunities Clause of the United States Constitution. With respect to the Commerce Clause claim, the United States Supreme Court has upheld the validity of state taxing authority under the Commerce Clause if the tax "[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

¶ 45 We see no Commerce Clause violation in this case. Because the settlement proceeds were paid in lieu of the proceeds received from the deemed asset sale of HAU, there is "a substantial nexus with the taxing state." Moreover, the tax was fairly apportioned, it did not discriminate against interstate commerce, and it was fairly related to the services provided by Utah because HAU

---

6. The Court added that the taxpayer's " 'burden is never met merely by showing a fair difference of opinion which as an original matter might be decided differently.' " *Id.* at 176, 103 S.Ct. 2933 (quoting *Norton Co. v. Dep't of Revenue,* 340 U.S. 534, 537–38, 71 S.Ct. 377, 95 L.Ed. 517 (1951)).

**346**

was a Utah corporation doing business in Utah.

¶ 46 We similarly reject the Mandells' claim that Utah's taxation of the settlement proceeds violates the Privileges and Immunities Clause. The Privileges and Immunities Clause protects the "right of a citizen of any State to remove to and carry on business in another without being subjected in property or person to taxes more onerous than the citizens of the latter State are subjected to." *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 296, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) (internal quotations omitted). In this case, however, the Commission imposed a tax on the Mandells' settlement proceeds because they were received in lieu of proceeds from the taxable sale of Utah assets. The tax did not increase (or decrease) when the Mandells became nonresidents. And this analysis is not altered by the fact that Nevada does not impose individual income taxes on its residents. Indeed, if Nevada did levy individual income taxes, Utah would likely be required to apportion some amount of the Utah source income to Nevada. *See, e.g.,* Utah Code Ann. § 59–10–118(2) (2006). Because the Mandells are not being singled out due to their status as nonresidents, there is no violation of the Privileges and Immunities Clause.

### CONCLUSION

¶ 47 We reject the Mandells' claim that the settlement proceeds were immune from taxation. We apply the "in lieu of" test to determine the character and nature of the settlement proceeds and conclude that they were received in lieu of proceeds that Mandell should have received from the 1998 deemed asset sale of HAU. As such, the settlement proceeds are taxable as Utah source income. When the gains or losses of an S corporation pass through to its shareholders, they retain their original character. Thus, the Utah Tax Commission had authority to tax the settlement proceeds. Affirmed.

¶ 48 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice WILKINS, and Justice NEHRING concur in Justice PARRISH's opinion.