[Nos. 64362-2-I; 64563-3-I.   Division One.   September 12, 2011.]

WILLIAM SERRES, *on Behalf of Himself and a Class of Persons Similarly Situated, Respondent*, v. THE DEPARTMENT OF RETIREMENT SYSTEMS ET AL., *Appellants*.

*Robert M. McKenna, Attorney General,* and *Sarah E. Blocki, Assistant,* and *Daniel T. Satterberg, Prosecuting Attorney, Karen A.P. Norby* and *Susan N. Slonecker, Deputies,* for appellants.

*James D. Oswald* (of *Law Offices of James D. Oswald*), for respondent.

*Stephen K. Strong* on behalf of former class members in *Roberts v. King County* and *Duncan v. King County,* amici curiae.

¶1 LEACH, A.C.J. — The Washington Department of Retirement Systems (DRS) and King County (County) appeal a determination that settlement payments made to class members as part of a class action settlement qualify as "compensation earnable" within the meaning of RCW 41.40.010(8). They contend the settlement payments do not meet the statutory definition of that term because the County did not pay them as salary or wages. Alternatively, DRS claims that if these payments are "compensation earnable," every class member owes retirement plan contributions under RCW 41.50.130(1). DRS further claims the trial court erred by refusing to join all members of the settlement class as necessary parties in this class action lawsuit. Finally, DRS challenges the trial court's award of

attorney fees to class counsel under the common fund doctrine.

¶2 Because the settlement payments compensated employees for individualized wage loss claims, they are "compensation earnable" under RCW 41.40.010(8). Furthermore, RCW 41.50.130(1) does not authorize DRS to collect plan contributions now from those members of the settlement class whose retirement allowances were not affected by the settlement payments. The trial court, therefore, appropriately declined to join the unaffected settlement class members as parties. Finally, because DRS is not an aggrieved party with respect to the attorney fee award, it cannot seek appellate review of the award. For these reasons, we affirm the trial court.

## FACTS

¶3 The core issue litigated in this case is whether settlement payments made in a class action should be included in the calculation of the retirement allowance for certain class members. This issue arises under relatively complicated facts.

¶4 In 1994, the Municipality of Metropolitan Seattle merged with King County and combined the two employee classification and compensation systems into a single system for all of King County. To identify and reconcile pay differences resulting from the merger, the County instituted the County Classification and Compensation Study (class comp study), which began in 1994 and continued for nearly a decade. As a result of the class comp study, King County began in 1996 to phase in pay increases followed by changes in job classifications.

¶5 In 1997, some nonrepresented employees sued King County (the *Roberts*[1] action) because the County paid them

---

[1] For the history of this litigation see *Roberts v. King County*, 107 Wn. App. 806, 27 P.3d 1267 (2001).

the same salary for 40 hours of work per week that it paid others in the same job classification for 35 hours of work per week. They claimed this pay difference violated the County's "equal pay for equal work" ordinance[2] and sought, among other relief, remuneration for past services back to 1994, prejudgment interest, double damages, attorney fees, and declaratory and injunctive relief.

¶6 In 2002, another group of nonrepresented employees sued King County (the *Duncan* action), alleging that the County had failed to appropriately adjust their compensation and job classifications. Their complaint requested compensation back to 1998, prejudgment interest, double damages, attorney fees, and declaratory and injunctive relief.

¶7 In both *Roberts* and *Duncan*, the parties agreed to postpone class certification pending discovery and settlement negotiations. The court consolidated the two cases for settlement purposes. In October 2003, the parties reached a provisional settlement resolving both actions, and counsel executed a settlement agreement. After conditionally certifying a settlement subclass, which ultimately resulted in approximately 350 current and former nonrepresented employees in the *Roberts* action and a subclass of approximately 1,567 current and former nonrepresented employees in the *Duncan* action, the court preliminarily approved the proposed settlement agreement. After notice to the class, the court entered findings of fact and conclusions of law approving the settlement.

¶8 Under the terms of the settlement agreement, the plaintiffs released all claims against the County. The agreement also recited that the County disclaimed liability, stating, "King County's entry into this Settlement Agreement is a result of compromise and does not constitute an admission of liability." But the County agreed to pay a cash settlement of $18.5 million, to provide "future relief" to

---

[2] KING COUNTY CODE 3.12.170, as amended by Ordinance 11032 (1993).

class members, and to pay employer-related expenses and other costs of approximately $5.5 million, for a total value of about $24 million. The agreement allocated the $18.5 million as follows: $6 million for monetary awards to members of the *Roberts* subclass, $8 million for monetary awards to members of the *Duncan* subclass, and $4.5 million for common fund attorney fees for class counsel. The agreement made no provision for exemplary damages, interest, declaratory orders, or other types of relief originally sought in the underlying litigation.

¶9 The settlement agreement set formulas for distribution of the separate funds established for the *Roberts* subclass and the *Duncan* subclass. Each formula provided for payment first of incentive awards to the named plaintiffs; then for payment to current employees; and finally to former employees, on the basis of when their county employment ended, in reverse chronological order (first 2002, then 2001, and so on). Employees who worked fewer than nine months received no award. The agreement described a different formula for calculating the award for members of each subclass.

¶10 Individual settlement awards for *Roberts* subclass members were calculated by multiplying their hourly rate of pay for each eligible pay period by the difference between the hourly pay rate received by the subclass member and that received by nonrepresented King County employees in the same job classification who were paid for a 35-hour work week. For example, if an eligible subclass member received a $25 rate of pay for two full years in 2001 and 2002 and worked 40-hour weeks, the member would receive about $14,862, calculated $25 x 4,160 hours x 14.29 percent (40-35/35). This formula provided the *Roberts* class members with monetary awards that compensated them for substantially all of their claimed loss.

¶11 The *Duncan* subclass formula was different. Current employees who had been reclassified and received higher pay rates by September 1, 2003, received an award

representing the amount they would have been paid if the County started paying the higher rate beginning January 1, 1998. Current employees who had not been reclassified and given a higher pay rate received an award equal to 2.41 percent of their pay for all eligible periods, with some offsets. According to the agreement, 2.41 percent equaled the average increase in pay nonrepresented employees received as a result of reclassification. Awards for former employees were calculated in a similar manner. Potential recipients of awards from the *Duncan* fund were required to provide the King County Claims Office with reviewed and corrected payroll history forms showing all pay periods during which they had worked during times covered by the settlement agreement.

¶12 The settlement agreement stated that payments made under it were "W-2 wage payments, subject to federal income tax withholding and deductions and contributions required for FICA, Medicare, and other deductions as required by law." It also provided, "King County shall withhold the customary amount for federal income tax purposes and shall make deductions and contributions for FICA, Medicare, and other deductions as required by law." The agreement did not expressly address how settlement awards would be treated for purposes of calculating retirement allowances.

¶13 After the court approved the settlement, King County's Office of Management and Budget (OMB) requested a determination from DRS that awards paid under the settlement were not "compensation earnable" under RCW 41.40.010(8)(a). If the award payments were not "compensation earnable," neither the County nor the subclass members would owe retirement plan contributions for them. DRS advised OMB by letter:

> Based upon the fact that the intent of the agreement is to settle the lawsuits, not provide retroactive salary payments to make the claimants whole, the monetary awards paid by King County as settlement of the *Roberts* and *Duncan* class action

lawsuits are not considered compensation earnable under RCW 41.40.010(8).

¶14 William Serres, a member of the *Duncan* subclass, retired in September 2001 with a Washington Public Employees Retirement Systems (PERS) Plan 1 monthly allowance. Serres wrote to DRS, demanding that his settlement award be considered "compensation earnable" for purposes of calculating his average final compensation. This would increase his retirement allowance. After DRS informed Serres that it could not recalculate his retirement allowance, Serres petitioned for agency review. DRS's presiding officer initially ruled that the *Duncan* settlement was for retroactive salary payments and met the definition of compensation earnable under WAC 415-108-457. Thus, any portion of the settlement attributable to Serres's average final compensation period would be included in the calculation of his retirement allowance.

¶15 King County filed a motion for reconsideration, and the presiding officer reversed DRS's earlier decision. The officer observed that "WAC 415-108-445(1)[3] influences the application of WAC 415-108-457(1)[4] because the nature of a disputed payment as retroactive salary payment must first be resolved." And because WAC 415-108-445 "makes paramount the reason for the payment in determining its nature," and "it is clear that the County made [the *Roberts/ Duncan*] payments to its employees and former employees to settle their claims . . . without admission of liability," "the reason for the payments will control and they will not be found to be retroactive salary payments."

---

[3] WAC 415-108-445(1)(a) states that "compensation earnable" "must meet the definition in RCW 41.40.010(8)." Subsection (1)(b) further provides, "The department determines whether payments to an employee are compensation earnable based on the nature, not the name, of the payment. The department considers the reason for the payment and whether the reason brings the payment within the statutory definition of compensation earnable."

[4] WAC 415-108-457(1)(b) states, "To qualify as reportable compensation under this section, the payment must be a bona fide retroactive salary increase. To ensure that is the case, the retroactive payment must be made pursuant to . . . [a] bona fide settlement of such a claim before a court or administrative agency."

¶16 Serres petitioned for review in superior court and sought certification of an ancillary class comprised of approximately 100 *Roberts/Duncan* members whose retirement allowances would be increased if the settlement payments qualified as "compensation earnable" within the governing statutes. DRS opposed certification of the purported class, arguing that the class should be expanded to include the additional 1,900 members from the underlying *Roberts/Duncan* litigation.[5] DRS reasoned that if Serres prevailed on the underlying legal issue, RCW 41.50.130 (the "error correction" statute) provided it the authority to collect employee contributions from all *Roberts/Duncan* members. Thus, the 1,900 class members could be adversely affected, requiring joinder.

¶17 King County filed a similar motion to join the remaining 1,900 class members as indispensible parties under CR 19. King County also filed a motion requesting a decision from the court that RCW 41.50.130 did not authorize DRS's collection of retroactive contributions from class members whose settlement awards did not change their average final compensation calculation. King County advised the court that granting its motion would negate the need to expand the certified class beyond the 100 members.

¶18 In separate orders, the trial court granted Serres's motion for class certification and King County's motion regarding RCW 41.50.130. The court also denied King County's motion to join the 1,900 unaffected *Roberts/Duncan* class members as indispensible parties but did not expressly rule on DRS's corresponding motion to expand the ancillary class. In addition, the court reversed DRS's final order, ruling that the settlement distributions were compensation earnable for purposes of the PERS statute. The court explained,

---

[5] DRS based this argument on two legal theories. First, that a broad ancillary class met the requirements of CR 23. Second, that joinder was required under CR 19 because the remaining class members were necessary parties.

[T]he fact that payment is made for purposes of settlement, or that it is made because a party feels generous or that it is made for any reason at all in terms of the motivation of the party entering into the agreement, it seems to me is not going to have any bearing here because the question is not what motivated the party. The question is what is the payment and what is it based upon.

¶19 Serres subsequently moved for an award of common fund attorney fees totaling $293,180.25, which equals 25 percent of the value of the increased retirement allowance owed to the *Serres* class plaintiffs.[6] DRS argued that the equal access to justice act, RCW 4.84.340 through RCW 4.84.360, with an award limit of $25,000.00, governed the award of attorney fees in judicial review proceedings, that Serres was not entitled to fees under that statute, and that the common fund doctrine did not apply. The court granted Serres's motion.

¶20 DRS and King County appeal.

## ANALYSIS

¶21 We must first decide whether the settlement payments are "compensation earnable" under RCW 41.40.010(8).

¶22 In reviewing an agency's order, we sit in the same position as the superior court[7] and apply the review standards set forth in the Washington Administrative Procedure Act, chapter 34.05 RCW.[8] We limit our review to the record of the administrative tribunal, not that of the trial

---

[6] Serres also moved to reduce the common fund by $20,000 to be paid as an incentive award.

[7] *D.W. Close Co. v. Dep't of Labor & Indus.*, 143 Wn. App. 118, 125, 177 P.3d 143 (2008).

[8] *See Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 77, 11 P.3d 726 (2000).

court.[9] RCW 34.05.570(3)(d) requires relief from an agency order when the decision is based on an erroneous interpretation or application of law. An agency's interpretation of a statute or regulation is a question of law reviewed de novo.[10] When reviewing questions of law, we may substitute our determination for that of the agency.[11]

¶23 The legislature established PERS as a retirement system for "employees of the state of Washington and its political subdivisions."[12] The system provides a retirement allowance based upon the employee's average final compensation and years of service.[13] RCW 41.40.010(6)(a) defines average final compensation for PERS Plan 1 members as "the annual average of the greatest compensation earnable by a member during any consecutive two year period of service credit months for which service credit is allowed." RCW 41.40.010(8)(a) defines "compensation earnable" as "salaries or wages earned during a payroll period for personal services." Thus, whether the *Roberts/Duncan* settlement distributions constitute compensation earnable within the meaning of the statute depends on whether the distributions were "salaries or wages earned during a payroll period for personal services."

¶24 When interpreting a statute, we seek to ascertain and give effect to the legislature's intent.[14] "Where statutory language is plain and unambiguous, a court will not construe the statute but will glean the legislative intent from the words of the statute itself, regardless of a contrary

[9] *Renton Educ. Ass'n v. Pub. Emp't Relations Comm'n*, 101 Wn.2d 435, 440, 680 P.2d 40 (1984).

[10] *D.W. Close Co.*, 143 Wn. App. at 126.

[11] *Postema*, 142 Wn.2d at 77 (citing *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 142-43, 969 P.2d 458 (1999)).

[12] RCW 41.40.020.

[13] *See* RCW 41.40.185, .620, .790.

[14] *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

interpretation by an administrative agency."[15] But where an ambiguity exists and the agency has technical knowledge or specialized experience relevant to the interpretive task, the agency is entitled to some deference.[16] Further, "[p]ension legislation is liberally construed to favor beneficiaries."[17]

¶25 Here, the applicable statutes do not define "salary" and "wages." Courts may resort to dictionary definitions to give undefined, nontechnical terms their usual and ordinary meaning.[18] Under this plain language approach, we must avoid imputing meaning that leads to " 'unlikely, absurd or strained' " results.[19]

¶26 *Webster's Third New International Dictionary* defines "salary" as a "fixed compensation paid regularly (as by the year, quarter, month or week) for services" or "remuneration for services given."[20] It defines "wage" as "a pledge or payment of usu[ally] monetary remuneration by an employer esp[ecially] for labor or services usu[ally] according to contract and on an hourly, daily, or piecework basis."[21] Similarly, *Black's Law Dictionary* defines "salary" as "[a]n agreed compensation for services . . . usu[ally] paid

---

[15] *Burton v. Lehman*, 153 Wn.2d 416, 422, 103 P.3d 1230 (2005).

[16] *See, e.g., Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 447 n.17, 120 P.3d 46 (2005) (explaining that an agency is entitled to deference when it adopts an interpretation of an ambiguous statute); *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 233, 110 P.3d 1132 (2005) (according deference when agency has specialized expertise) (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)).

[17] *Grabicki v. Dep't of Ret. Sys.*, 81 Wn. App. 745, 750, 916 P.2d 452 (1996) (citing *Hanson v. City of Seattle*, 80 Wn.2d 242, 247, 493 P.2d 775 (1972)).

[18] *Burton*, 153 Wn.2d at 423 ("If the undefined statutory term is not technical, the court may refer to the dictionary to establish the meaning of the word.").

[19] *Burton*, 153 Wn.2d at 423 (quoting *State v. Stannard*, 109 Wn.2d 29, 36, 742 P.2d 1244 (1987)).

[20] Webster's Third New International Dictionary 2003 (2002).

[21] Webster's at 2568.

at regular intervals on a yearly basis,"[22] and "wage" as "[p]ayment for labor or services, usu[ally] based on time worked or quantity produced; specif[ically], compensation of an employee based on time worked or output of production."[23] Thus, the settlement awards are "salary or wages" if they constitute payment for services or labor.

¶27 The parties agree that we should look to the nature of the settlement awards to determine whether they were paid as salary or wages but disagree how we make that determination. Serres suggests that we should look to the nature and basis for the action settled because amounts received in compromise of a claim have the same nature as the claim compromised. According to Serres, because the claims settled arose exclusively out of a claimed failure to pay proper compensation, the settlements awards paid were salary or wages.

¶28 King County also looks to the nature and basis for the action settled but claims that the back-pay claim was only one of numerous complicated issues resolved by the settlement agreement. It asserts that because the "objective reason for the *Duncan/Roberts* settlement payments was to settle all of the class members' claims," DRS properly determined that the reason for payment was not payment of salary or wages.

¶29 DRS takes a different approach. It notes that the settlement agreement affirmatively stated that King County denied liability and claims class counsel later confirmed to DRS that "the parties had no intent that the settlement awards would be deemed remuneration for past services." DRS also contends that the awards were paid "strictly to terminate the protracted litigation." Therefore, according to DRS, the awards were not a payment of salary or wages.

---

[22] BLACK'S LAW DICTIONARY 1454 (9th ed. 2009).

[23] BLACK'S at 1716.

¶30 We agree with Serres. In the context of deciding whether settlement payments are taxable, "courts uniformly look to the character and nature of the settlement proceeds or damages to determine their taxability, asking 'in lieu of what were the damages awarded'?"[24] While this case presents a different issue, we find the answer to the question "in lieu of what were the settlement awards paid?" instructive here as well. The uncontested facts overwhelmingly establish that the settlement awards compensated class members for salary claimed to be owed but not paid. In other words, the awards were paid in lieu of wages and salary that the plaintiffs claimed should have been paid in the past.

¶31 In both *Roberts* and *Duncan*, the plaintiffs sought money for work performed by them for the County for which plaintiffs claimed not to have been fully paid. The legal theories advanced in each lawsuit were based upon the premise that the County had not paid the full amount it should have paid to its employees for services provided. The claims for interest, exemplary damages, attorney fees, and equitable relief all derived from this single premise. The *Roberts* complaint addressed a situation where two groups of employees were paid at different rates for the same work, contrary to county ordinance. And the *Duncan* complaint addressed the disparate treatment of certain county employees who had not received increased pay as a result of new classifications some years after the County approved these classifications in response to the class comp study.

¶32 The settlement agreement treated the individual settlement awards as payment of retroactive wages. The formulas set forth in the agreement provided for payments based on individualized calculations related to amounts claimed owed for services provided. The agreement characterized the settlement payments as "W-2 wage payments, subject to federal income tax withholding and deductions

---

[24] *Mandell v. Auditing Div.*, 2008 UT 34, ¶ 15, 186 P.3d 335.

and contributions required for FICA, Medicare, and other deductions as required by law."[25] The County required plaintiffs in the *Duncan* subclass, of which Serres is a member, to present detailed records of payroll history to the county claims office before it calculated and paid settlement awards. If a *Duncan* class member had already received increased pay through other means, the County reduced that individual's settlement award by a corresponding amount. The settlement agreement established separate distribution funds for each subclass. Each fund was never commingled with county payments for the other subclass, attorney fees, future relief, or other costs associated with administering the settlement.[26] Finally, the trial court's order approving the settlement described the settlement awards as "back compensation."

¶33 Because the foregoing uncontested facts clearly demonstrate that the individual settlement awards provided retroactive compensation for services provided by county employees, the awards are "compensation earnable" within the meaning of RCW 41.40.010(8).

¶34 DRS and King County further contend DRS adopted WAC 415-108-445 and WAC 415-108-457 as legislative rules necessary for implementing RCW 41.40.010(8), and because duly promulgated legislative rules have the force

---

[25] DRS cites *Licciardi v. Kropp Forge Division Employees' Retirement Plan*, 990 F.2d 979 (7th Cir. 1993), for the proposition that treating the distributions as W-2 wages for Internal Revenue Service purposes does not necessarily make them retroactive salary payments for retirement purposes. But as the Seventh Circuit noted, *Licciardi* applied principles of contract interpretation to determine whether the plaintiff was entitled to additional retirement benefits under the terms of a settlement agreement. *See Lynn v. CSX Transp., Inc.*, 84 F.3d 970, 976-77 (7th Cir. 1996). By contrast, the issue here turns on an interpretation of the pension statute, not the language of the compromise agreement. Besides, the other factors listed above provide ample support for the conclusion that the settlement awards constitute compensation earnable under RCW 41.40.010(8).

[26] The trial court order approving the settlement affirmed that "[t]he County will pay $18.5 million for back compensation to settle *Roberts* and *Duncan*. The County will also pay about one million dollars for future relief, approximately $1.4 million for employer-related expenses such as FICA and PERS, and an estimated $3.1 million for settlement administration and other costs."

and effect of law, the presiding officer's application of these regulations should be affirmed. This argument fails.

¶35 Washington courts distinguish between legislative and interpretative agency rules. Legislative rules "bind the court if they are within the agency's delegated authority, are reasonable, and were adopted using the proper procedure."[27] Interpretative rules, by contrast, have no binding effect on the courts at all.[28] Instead, they

> serve merely as advance notice of the agency's position should a dispute arise. . . . The public cannot be penalized or sanctioned for breaking them. They are not binding on the courts and *are afforded no deference other than the power of persuasion.* Accuracy and logic are the only clout interpretive rules wield.[29]

¶36 Here, WAC 415-108-441 states that the purpose and scope of the compensation earnable rules is to "codify [DRS's] *interpretation* of statutes and administrative practice regarding classification of payments as compensation earnable in PERS Plan 1, 2, or 3." (Emphasis added.) Plainly, the WACs are by their own terms interpretative rules rather than legislative ones. We therefore need not give them substantial weight when construing the governing statute. Nor, for that matter, must we defer to the presiding officer's interpretation of the regulations.

¶37 Next, DRS claims RCW 41.50.130(1) grants it plenary authority to correct records *and* collect retirement contributions for the 1,900 *Roberts/Duncan* class members whose retirement allowances were not affected by the settlement distribution. Again, we disagree.

¶38 A statute's plain meaning is derived from the language of the statute as a whole.[30] RCW 41.50.130(1) reads in pertinent part,

---

[27] *Ass'n of Wash. Bus.*, 155 Wn.2d at 446-47.

[28] *Ass'n of Wash. Bus.*, 155 Wn.2d at 447.

[29] *Ass'n of Wash. Bus.*, 155 Wn.2d at 447 (emphasis added).

[30] *Campbell & Gwinn*, 146 Wn.2d at 10-11.

> The director may at any time correct errors appearing in the records of the retirement systems listed in RCW 41.50.030. Should any error in such records result in any member, beneficiary, or other person or entity receiving more or less than he or she would have been entitled to had the records been correct, the director, subject to the conditions set forth in this section, shall adjust the payment.

This statute is unambiguous. The director has general authority to correct errors in the record. But there is no concomitant authority under this statute to adjust allowance payments unless the error causes beneficiaries to receive greater or fewer retirement benefits than those to which they are entitled.[31]

¶39 Here, DRS erred by failing to categorize the settlement awards as "compensation earnable" for purposes of calculating retirement allowances. The director, therefore, may correct this error under RCW 41.50.130(1). However, this error resulted in an underpayment of retirement benefits only to Serres and those similarly situated to him. For the remaining 1,900 *Roberts/Duncan* class members, the County paid the settlement awards to those members outside the final compensation period for each of them. Thus, the payment had no impact on their retirement allowances. Because RCW 41.50.130(1) requires an underpayment or overpayment of a retirement allowance as a precondition to payment adjustment, RCW 41.50.130(1) does not allow the DRS director to now collect contributions through payment adjustments based upon the settlement awards to the 1,900 unaffected class members.

---

[31] *See also City of Pasco v. Dep't of Ret. Sys.*, 110 Wn. App. 582, 589, 42 P.3d 992 (2002) ("RCW 41.50.130 . . . unambiguously gives the Department Director authority to correct errors appearing in the records . . . that cause members or beneficiaries to receive more or fewer benefits than those to which they are entitled.").

¶40 Therefore, the trial court did not abuse its discretion by denying DRS's CR 19(a)(1) joinder claim.[32] CR 19 requires joinder of persons necessary or indispensable to a just adjudication of the action.[33] "A party is a necessary party if the party's absence from the proceedings would prevent the trial court from affording complete relief to existing parties to the action or if the party's absence would either impair that party's interest or subject any existing party to inconsistent or multiple liability."[34] But persons are not necessary parties even if they are involved in the subject matter of litigation if no recovery is sought against them and judgment would not prejudice their interests.[35] As explained above, the trial court's judgment in this case had no effect upon the 1,900 *Roberts/Duncan* class members not joined. The trial court, therefore, did not err by rejecting the claim that the unaffected members are indispensible parties.

¶41 Finally, we address DRS's challenge to the trial court's award of nearly $290,000 in common fund attorney fees. "Only an aggrieved party may seek review by the appellate court."[36] The plaintiff class has the burden of paying the attorney fees awarded by the trial court. DRS

---

[32] We review a trial court's decision under CR 19 for an abuse of discretion, but we review any legal conclusion underlying a CR 19 determination de novo. *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 493, 145 P.3d 1196 (2006).

[33] CR 19(a) provides,

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (A) as a practical matter impair or impede his ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

[34] *Coastal Bldg. Corp. v. City of Seattle*, 65 Wn. App. 1, 5, 828 P.2d 7 (1992).

[35] *See In re Meretricious Relationship of Long*, 158 Wn. App. 919, 930, 244 P.3d 26 (2010).

[36] RAP 3.1.

has not demonstrated any financial impact to it from the award. Neither has it demonstrated that class counsel have requested or received any public funds to pay their fees. DRS is not aggrieved by the attorney fee award it challenges and cannot seek appellate review of it.

## CONCLUSION

¶42 For the foregoing reasons, we affirm the trial court.

BECKER and SCHINDLER, JJ., concur.